**Christopher COFFIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 832–93.

Court of Criminal Appeals of Texas, En Banc.

Oct. 12, 1994.

Luis C. Labrado (Court-appointed), Dick Stengel, David C. Guaderrama, Bruce W. Weathers, El Paso, for appellant.

Steve W. Simmons, Former Dist. Atty., Debra Morgan, Asst. Dist. Atty., El Paso, Robert Huttash, State's Atty., Austin, for the State.

*OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

CLINTON, Judge.

Appellant, a minor at the time of the offense, was certified to stand trial as an adult, and convicted of murder. The jury assessed his punishment at forty years confinement in the penitentiary. At the punishment phase of trial the State sought to introduce a transcript of testimony adduced at the juvenile certification hearing from a psychologist, Dr. Richard Walker, who had died in the interim. To appellant's hearsay objection, the State interposed Tex.R.Cr.Evid., Rule 804(b)(1), arguing that Walker's prior testimony was admissible because he was no longer available.[1] The trial court ruled that appellant had been afforded an opportunity, and had had a similar motive to cross-examine Walker at the certification hearing, and allowed the prior testimony.

On original submission on direct appeal the court of appeals held that use of Walker's prior testimony at the punishment phase did not violate appellant's Sixth Amendment confrontation rights because it met the requi-

---

1. Rule 804(b)(1) reads, in relevant part:

    **(b) Hearsay exceptions.** The following are not excluded if the declarant is unavailable as a witness:

    (1) **Former testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, had an opportunity and similar motive to develop the testimony by direct, cross, or re-direct examination.

sites of Rule 804(b)(1). Coffin v. State, (Tex. App.—El Paso, No. 08–87–00294–CR, delivered May 23, 1990). In so holding, however, the court of appeals did not explicitly address whether appellant had had a "similar motive" to cross-examine Walker at the certification hearing. This Court therefore granted appellant's first petition for discretionary review, and summarily remanded the cause to the court of appeals to consider that question. Coffin v. State, (Tex.Cr.App., No. 1011–90, delivered June 24, 1992). Unhappy to have the cause before it again, the court of appeals nevertheless expressly decided the issue of similar motive, concluding—this time in a published opinion—that appellant "would have the same interest in challenging" Walker's testimony at the punishment phase as he had had at the certification hearing. *Coffin v. State*, 850 S.W.2d 608, at 610 (Tex.App.—El Paso 1993). Again it affirmed appellant's conviction. We granted appellant's second petition for discretionary review to examine the issue of similar motive in some detail. Tex.R.App.Pro., Rule 200(c)(2).

## I.

### A.

Appellant's certification hearing occurred on September 29, 1986. At that time the juvenile court was authorized to waive its exclusive original jurisdiction and transfer appellant to the district court for criminal proceedings if, *inter alia*, "the juvenile court determines that because of the seriousness of the offense or the background of the child the welfare of the community requires criminal proceedings." V.T.C.A. Family Code, § 54.02(a)(3). Among the non-exclusive statutory considerations that may inform the juvenile court's decision are "the prospects of adequate protection of the public and the likelihood of rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court." V.T.C.A. Family Code, § 54.02(f)(6).

At the certification hearing the State first presented its evidence that appellant murdered one Jaime Alvarez by striking him in the forehead with a crowbar while Alvarez was incapacitated by alcohol. Appellant committed this wantonly random killing in concert with other youths. Then the State called Dr. Walker to the witness stand. His testimony was relatively brief. Walker had interviewed appellant three weeks before the hearing, on September 9, 1986. From a complete battery of psychological tests Walker concluded that appellant showed no evidence of psychotic thinking. Walker testified appellant could distinguish right from wrong, was capable of comprehending the proceedings against him, and was age-appropriate in his functioning. Finally the State asked Walker the following:

"Q. Now, if in fact this boy was found guilty of the offense of murder, what is your opinion as to what length of time would be needed to rehabilitate this boy for that crime?

A. It would be lengthy, and maybe at this point in time perhaps complicated by a number of factors, but it would be lengthy at this point, assuming what you said in evidence I would say change in this young man's life does not come easily for him.

Q. Could you be a little more specific with lengthy?

A. Lengthy? I wouldn't want to attempt to take this kind of psychological pattern and try to change it under a period of several years. I would be a couple of years of extensive therapy and some gradual decrease in follow-up."

On cross-examination, appellant touched only briefly upon the subject of rehabilitation:

"Q. You're not really able to say anything about rehabilitation, isn't that correct?

A. In terms of rehabilitation, you're placing me in a double bind in the sense that I don't have, you know, what are going to rehabilitate? That is the question, and I don't know. I can tell from the pattern here that this is not an easy young man to change. He tends to be rigid, he tends to—unfortunately, he'll listen mostly to his own voice.

Q. Is this taken from the testing?

A. Yes, you can see it on the tests."

This is the testimony later offered by the State at the punishment phase of trial, Dr. Walker having died in the interim.

Next the State presented the testimony of Dr. David Briones, a psychiatrist, who had examined appellant some four or five days before Walker did, and testified in far greater detail. Briones confirmed that appellant was not psychotic, but that "perhaps with severe stress [he] can become psychotic." He diagnosed appellant as suffering from:

"... dysthymic disorder with a lot of depressive symptomatology which I feel is due to long-standing stress with a severe family, parental and intrapersonal turmoil, and this gone on for at least three or four years. He fits the criteria for conduct disorder, socialized and aggressive. This is superimposed, as I mentioned, on a developing character structure with isolated schizoid features and perhaps impulsive features. He has a substance abuse problem, marijuana and alcohol; I think he drinks alcohol sporadically to the point of excess drinking. There is a possible attention deficit disorder evidenced by ... neuropsychological testing...."

Asked whether, should it prove appellant did commit the murder in this cause, "the likelihood of rehabilitation of" appellant, Dr. Briones replied:

"A. Well, in my opinion, that's given the data that we have and the longstanding nature of the problems, I think we are dealing with several years. I would say at least four years in a strictly supervised and long-term highly structured settings [sic]. I think there is a possibility that—two things have to be present: one, the availability of this kind of case, residential care, and number two, he has to make an attitudinal change. His idea is that it's really not his personal problems so much as circumstances, and that's not including prognosis. He has not accepted internally a lot of responsibility for his behavior, his psychological behavior, his psychological problems, the nature of his problems. It's going to take a long time for him to look at that and deal with it."

On cross-examination, Briones testified, *inter alia:*

"Q. When you said that he needed a highly structured setting what did you mean?

A. To me the ideal would be a residential treatment center that deals with adolescents, mid-adolescents or late adolescents, and this is a daily contact with therapists, a daily contact with counselors who restructure his role model, daily contact with school and other organizations that gives him a very good sense of tranquility and organization in his life. And if he receives this for many years it may have an impact. As I said, he has to turn that corner somewhere along the line and become aware of the problems he has.

Q. Are there residential treatment centers in Texas?

A. Yes, there are. I think most of them are private, although there are some that are public funded, but not too many.

Q. Would you be recommending a place where he's under lock and key and—

A. Well, he—

Q. —not allowed to go out in the community?

A. Well, if you're saying from the legal aspect he has to have that available for society's sake, I guess, because of the nature of the crime, but from a psychiatric viewpoint, at the beginning he might need to be in a close environment because of his reluctance to admit to treatment, but later on he probably wouldn't.

\*    \*    \*    \*    \*    \*

Q. It [appellant] were placed in a situation where he is not getting any sort of therapy, what would be the prognosis?

A. Well, it would be pretty negative for any restructuring of the problems—restructuring of the personality problems that he has. I certainly don't think it would help his dysthymic disorder; I don't think he would get any better if he doesn't get any treatment. I think he should get it even if he is incarcerated somewhere along the line.

\*    \*    \*    \*    \*    \*

Q. When you talk about residential treatment center, how long a period of time are we talking about, more or less?

A. Well, I would say at least four years in a residential treatment center and then

perhaps—well, it's hard to say how many years for all of this, but several years in that type of center and then a follow-up in a perhaps less intensive, like a boys' ranch or something like that might be indicated. I don't think he should be capable of going back to the open environment before several years.

Q. So you are saying that he should not be in society or in the community for several years?

A. Not given what I know, the circumstances.

\* \* \* \* \* \*

Q. In a residential treatment center, he would be with other people, isn't that correct?

A. Yes.

Q. And do you have any opinion regarding violence with other people in that sort of setting?

A. Whether he would be violent towards others in that kind of setting? I don't think so. I think you're taking two things away: You are taking the volatile home situation, and the other one you are taking away drugs and alcohol, which is another source of what causes a lot of his regression. I think without the alcohol, the family situation in drugs, you don't have a lot of potential for aggression, in my opinion.

Q. If he were put in any place other than a residential treatment center, a foster home or some other private institution away from the family and drugs, would it achieve the same purpose?

A. I'm not sure because he's not getting any formal ongoing treatment; it depends on who is going to treat him and how often. I think he has a severe problem which has to be addressed with intensive treatment.

\* \* \* \* \* \*

Q. Would peer pressure to commit an offense be the kind of stress you were talking about wherey [sic] [appellant] becomes close to psychosis?

A. Well, I'm not sure of the psychosis, but he's the type that will respond or be intimidated by peer pressure if it's given in a way that—well, he's more—in my opinion, he's easily susceptible to severe peer pressure.

Q. If he were found guilty and place in a penitentiary, wouldn't he be subjected to peer pressure?

A. I'm sure, yes, that's part of the environment in prison setting.

Q. And would would [sic] be your prognosis if he was placed in that sort of setting?·

A. I think he would have massive difficulties there. I am almost guessing that if he got in that situation he would be transferred to a psychiatric unit. I'm almost sure of it. But of course a prison is a very different environment. The doctors there are under a lot of pressure, but at least he would be separated from the regular inmates."

The State's last witness was Manuel Torres, a juvenile probation officer with the El Paso County Juvenile Probation Department. On direct examination the State questioned Torres about appellant's prospects for rehabilitation, given the resources available to the juvenile justice system.

"Q. Are you familiar with the facilities that are available if in fact this juvenile is adjudicated a delinquent child in this case?

A. Yes, ma'am, I am.

Q. And what are these facilities?

A. We have placement at Project Crossroads, placement in a foster home under foster care, and we have commitment to the Texas Youth Commission.

Q. Now, these placements in foster care, are these part of probation?

A. Yes, ma'am.

Q. Tell us about probation. What is the longest period of probation in the juvenile justice system?

A. We have supervised probation, from six months up to a year, not to exceed a year, unless the Court extends it for a longer period of time.

Q. And what is the longest that a juvenile can be placed on probation, supervised or unsupervised?

A. Up to the age of 18.

Q. What about commitment to TYC? What is the age limit on that?

A. Up to the age of 21. However, the youngster would only be kept there for two years.

Q. How do you know that?

A. There is a policy at the Texas Yuoth [sic] Commission that, no matter what type of offense may have been committed, the maximum period that a youngster will be kept there is two years.

Q. And did you speak with somebody at TYC regarding this?

A. Yes, I spoke with Mary Taggart, Youth Program Supervisor for the Texas Youth Commission who indicated to me that juveniles referred to them for serious offenses will only remain at TYC for two years.

Q. Mr. Torres, after a youngster is released from TYC, what type of services are offered to them from TYC?

A. None that I know of.

Q. If the Court was to retain jurisdiction of this juvenile and he was adjudicated a delinquent child, would any of these facilities provide a viable placement for rehabilitation of this juvenile?

A. No, ma'am, they would not.

Q. And what is the likelihood of rehabilitation of this juvenile?

A. There is none."

On cross-examination, Torres reiterated his opinion that appellant could not be rehabilitated within the juvenile justice system.

"Q. Mr. Torres, you are basing your recommendation [that appellant be certified to stand trial as an adult offender] just on the nature of the seriousness of the offense? Is that the only factor that you have taken under consideration?

A. And the fact that the juvenile justice system does not have the time to work with a youngster once he reaches the age of 18 as we lose all jurisdiction at that time.

Q. But if he's placed on probation there is also no time to work with him?

A. That's correct.

Q. So, really, there is nothing that can be done for this person under the juvenile justice system?

A. Not to my knowledge, that's correct."

For his part, appellant presented two witnesses at the certification hearing. The first was Dr. Arthur Ramirez, a psychiatrist. Ramirez reiterated that appellant had abused drugs and alcohol and suffered a conduct disorder. He added, however, that because of appellant's youth, his personality had not "crystallized," and that he is "certainly amenable to change, there is no question about it." Ramirez opined that any treatment for appellant should involve family therapy as well as individual psychotherapy. The juvenile court at one point asked Ramirez whether he based his opinion on the "medical model" as opposed to the "justice model," and Ramirez acknowledged that was correct.

Lastly, appellant called Frank Lozito, Chief Probation Officer of the West Texas Regional Area. Lozito testified essentially that his department "never" recommends probation for adults in murder cases, but that if a jury were to give probation to a fifteen year old boy who was tried as an adult, the probation system would "have to" supervise him. Counsel for appellant inquired:

"Q. If he were not to reside in his home or ordered by the Court not to reside in his home, would you have a placement?

A. We have the Court Residential Treatment Center that we put people in there; that's the only thing we have as far as facilities are concerned, we don't have any other type of facility.

Q. Would you feel comfortable putting a 15–year–old in that sort of setting?

A. No, I wouldn't.

Q. And why?

A. Simple reason is because of the age, the type of offense and the type of offenders that are residing in that particular center.

Q. Would you have a concern for the 15–year–old's welfare?

A. Yes, I would."

At the conclusion of the hearing, proclaiming that "the time has come in our society

where the justice model has to take precedence over the medical model ... [and] ... the public safety and interest become uppermost in our minds[,]" the juvenile court certified appellant to be tried as an adult. In its written order to that effect, pursuant to V.T.C.A. Family Code, § 54.02(h), the court expressly found that appellant:

> "cannot be treated or rehabilitated, nor will his best interests be served with the resources that are currently available to the Juvenile Court of El Paso County, Texas, either on a local basis or state-wide basis, primarily because of the psychiatric testimony that he is in need of long-term treatment, which treatment must be of a sophisticated nature, which cannot be delivered within the present juvenile justice system. * * * The public will not be adequately protected by the use of procedures, services, and facilities available to this juvenile court, as the juvenile is in need of long-term treatment and rehabilitative services and it is unlikely that the juvenile will be adequately rehabilitated or treated by use of such procedures, services and facilities."

Thus it is apparent that the juvenile court was weighing the best interest of the child in obtaining adequate treatment for his problems against the "protection of the public." § 54.02(f)(6), supra. In that context the court must certainly have taken into account testimony from Drs. Walker and Briones that appellant's rehabilitation through treatment would take a number of years, together with Torres' testimony that juvenile probation ordinarily lasts only a year, and that TYC has a policy of releasing its charges within two years, to conclude that the resources of the juvenile system were inadequate to ensure appellant could be rehabilitated before once again released into the general public. It would certainly have behooved appellant, under these circumstances, to contradict, impeach or de-emphasize any testimony that his rehabilitation would be a lengthy process.

### B.

At the punishment phase of appellant's trial, the State reintroduced all guilt phase evidence, and rested. Appellant then took the stand in support of his application for felony probation, testifying he had never before been convicted of a felony offense and that he could abide by any terms and conditions of probation the trial court might choose to impose, including remaining under the custody of a community based facility and attending psychological counseling at his own expense. Thus, once again "the best interest of the public as well as the defendant" was a focus of inquiry, see Article 42.12, §§ 3 & 3a(a), V.A.C.C.P., as those provisions read as of September and October of 1987, when appellant was tried, including any conflict between appellant's best interest and that of society.

Once again appellant called Dr. Ramirez to the witness stand. Again at the punishment phase, Ramirez testified that appellant had a substance abuse problem and a conduct disorder, but was not psychotic or sociopathic; that his problems were treatable, but he had never received treatment for them; that his adult personality had not crystallized, and that he was capable of rehabilitation. Again he recommended both individual treatment for appellant, and family therapy. He testified further that there exist in El Paso County community based facilities where appellant could be treated if placed on probation. On cross-examination, when asked how long rehabilitation would take, Ramirez replied: "I will describe the ideal. The ideal would be for him to be in a residential treatment center for adolescents, disturbed adolescents for six months to a year. If I had my choice, that's what I would do." The prosecutor asked again:

"Q. How long will it take to rehabilitate him?

A. Six months to a year.

Q. And he will be all well and okay?

A. He would—He has a good potential on that.

\* \* \* \* \* \*

Q. You would disagree then with the other doctors who said it could take several years, a very long time?[2]

2. The prosecutor was evidently referring to testimony at earlier proceedings such as the certifica-

A. Yes, I disagree with that.

Q. But if it did take several years and a very long time, are you aware that after he has served one third of his probationary sentence he can be released off probation?

A. No, sir, I am not aware of that.

Q. No longer required to go to treatment?

A. No, sir, I am not aware of that.

Q. No longer required to seek rehabilitation and self help?

A. No, sir, I am not aware of that.

Q. So, if his—If the money runs out, the parents run out of money before he has been rehabilitated or he gets released off of probation after serving one third of the ten year probationary period and he hasn't been rehabilitated, then he could go out and repeat this same type of crime, couldn't he?

A. That possibility is there."

Thus it is apparent that the question how long it would take to rehabilitate appellant became an operative issue at the punishment phase of trial, just as it had been previously at the certification hearing. To rebut Ramirez' testimony that appellant could be rehabilitated in six months to a year, the State offered a transcript of Dr. Walker's previous testimony from that hearing.[3] Appellant objected that "the point of this hearing was very different than the point of this hearing and my cross-examination of Dr. Richard Walker will be very different and we are not afforded that opportunity to do so with this testimony just being presented in this document." The trial court overruled appellant's objection, expressly finding appellant had had "opportunity and similar motive" to cross-examine Walker at the certification hearing.

Without elaboration, the court of appeals on remand agreed that at the certification hearing appellant "had a motive to challenge Dr. Walker's statements indicating that the time for rehabilitation would be lengthy." *Coffin v. State*, supra, at 610. We granted appellant's petition for discretionary review in order to examine the question in more depth. We will affirm the judgment of the court of appeals.

## II.

■ Rule 804(b)(1) does not require that in order for prior testimony to be admitted as an exception to the hearsay rule the opponent of the evidence have had an *identical* motive to challenge the testimony at the prior proceeding as he now has at trial. It requires only that he have had a "similar" motive. "[N]either the form of the proceeding, the theory of the case, nor the nature of the relief sought need be the same." M. Graham, Federal Practice and Procedure: Evidence § 6793 (Interim Edition 1992), at 784.[4] "[O]nly the particular issue as to which the testimony was first offered must be substantially similar to the issue upon which offered in the current action." *Id.* See also 2 J. Strong, McCormick on Evidence § 304 (4th ed. 1992), at 315. As with opportunity, similar motive *vel non* must be determined on a case-by-case basis, according to the particular facts and circumstances. Cf. *Russell v. State*, 604 S.W.2d 914 (Tex.Cr.App. 1980) (for purposes of Sixth Amendment confrontation guarantee, determination whether defendant had opportunity to cross-examine witness at prior proceeding is a fact-bound inquiry). See also *United States v. Salerno*, 505 U.S. ——, at ——, 112 S.Ct. 2503, at 2509, 120 L.Ed.2d 255, at 264 (1992) (Blackmun, J., concurring); *United States v. DiNapoli*, 8 F.3d 909, at 914 (C.A.2 1993).

The ultimate purpose of a juvenile certification hearing differs greatly, of course, from the purpose of a punishment proceeding following a guilty verdict in the trial of an adult

---

tion hearing, since no other psychologist or psychiatrist had yet testified at the punishment hearing at all, much less offered an opinion as to the likely duration of appellant's rehabilitation.

3. The record does not reveal whether the State made any attempt to rebut Ramirez' testimony by calling Dr. Briones to the stand at the punishment phase.

4. Cases and commentaries interpreting the Federal Rules of Evidence are instructive in our construction of similarly worded provisions in our own rules. *Montgomery v. State*, 810 S.W.2d 372, at 376, n. 2 & 387, n. 2 (Tex.Cr.App.1990, 1991) (opinions on original submission and on rehearing on Court's own motion); *Jones v. State*, 843 S.W.2d 487, at 490 (Tex.Cr.App.1992).

offender. The juvenile court must decide whether a juvenile offender should stand trial as an adult, according to criteria such as those laid out in § 54.02(f). At the punishment phase of trial, the factfinder must decide what sentence to impose within the applicable range, and whether, if the defendant qualifies, the ends of justice and the best interest of the public and the defendant counsel in favor of probation. Within these obviously different sets of parameters, however, it is certainly possible that substantially similar issues can arise. We have set out the circumstances of the certification and punishment hearings in this cause in some detail in order to illustrate that there is a basis in the record from which the trial court could reasonably have ruled that appellant harbored a similar motive to cross-examine Dr. Walker at the former hearing as he did at the latter.

It was apparently one of the State's strategies at the certification hearing to persuade the juvenile court that the juvenile justice system would not have custody and control over appellant for a sufficient period of time to effect his rehabilitation. This strategy is evident in the testimonies of Drs. Walker and Briones that it would take a number of years to rehabilitate appellant, in combination with Torres' testimony that neither juvenile probation nor TYC could maintain custody of appellant for longer than two years. The juvenile court judge was obviously receptive to this strategy, judging by his questions to Dr. Briones (distinguishing the "medical model" from the "justice model"), his pronouncement from the bench ("the time has come in our society where the justice model has to take precedence over the medical model"), and his written order finding inadequate protection to the public because "the juvenile is in need of long-term treatment and rehabilitative services" not available within the juvenile justice system. Under the circumstances, it would have behooved counsel for appellant to challenge the basis for any opinion that it would take a long time

to rehabilitate his client. A shorter period of rehabilitation would have militated against a conclusion that the juvenile justice system could not reform appellant while at the same time insulating him from the public.

■ That it would have similarly behooved counsel for appellant to refute any notion that his rehabilitation would take long at the punishment phase of trial is clear. A lengthy period of rehabilitation would certainly tend to dissuade the jury from recommending probation, since that would increase the risk to the public that appellant might commit another offense while at large on probation before his behavior could be reformed. Thus, each proceeding involved an issue of whether appellant might be exposed to the public at a time when he still posed a significant danger. Appellant had at least as great a motive to discount testimony that his rehabilitation would be lengthy at the certification hearing as he did at trial. Indeed, while at the certification hearing appellant did not specifically attack Walker's assessment of how long it would take to rehabilitate him, he did question Walker's ability in general to assess his prospects for rehabilitation (*viz:* "You're not really able to say anything about rehabilitation, isn't that correct?").

Appellant argues that Dr. Walker's testimony related to rehabilitation within the specific context of the juvenile justice system; that within the context of the adult penal system rehabilitation, and the length thereof, take on an entirely different meaning; and that appellant had no motive to question Walker at the certification hearing regarding how long it would take the penal system to rehabilitate him. We disagree with appellant's factual premise, however. Neither Walker, Briones, nor eventually Ramirez testified in any respect as to length of rehabilitation specifically within either the juvenile justice system or the adult penal system. Rather, each apparently testified to length of rehabilitation given an optimal therapeutic environment.[5] Because Walker's testimony

---

**5.** It is true that the State specifically sought Walker's opinion of how long it would take to rehabilitate appellant "if in fact [he] was found guilty of the offense of murder[.]" We do not take this necessarily to ask, however, how long it would take for the penal system to rehabilitate

appellant. The trial court could easily have understood the question to be directed to length of rehabilitation, given the best of all possible therapeutic environments, if in fact appellant's conduct disorder, etc., was so serious that he killed a man. In context of Walker's other testimony, as

was thus generic, not tailored specifically to length of rehabilitation within either the juvenile or the adult system, it was relevant to the question whether appellant should get probation at the punishment phase in much the same way and to the same extent that it had been relevant earlier to the question whether the juvenile justice system would have time to reform him. The trial court was justified in finding that appellant's motive to challenge it was, at the very least, similar.

Appellant also argues that to have attacked Drs. Walker and Briones' conclusions that rehabilitation would be lengthy at the certification hearing would have been useless given the strength of the State's case, and that to have done so would only have damaged his credibility before the juvenile court. By this appellant seems to suggest that to challenge the experts' testimony would have been a bad tactical decision. But having a similar motive and choosing not to act on it, even if for a sound tactical reason, is not the same as having no similar motive at all. See *United States v. Salerno,* supra, 505 U.S. at ——, 112 S.Ct. at 2511, 120 L.Ed.2d at 266 (Stevens, J., dissenting); and cf. *United States v. DiNapoli,* supra, at 914 & n. 5 ("Though the availability of substantial ways of challenging testimony that were not pursued by an examiner is pertinent to the 'similar motive' inquiry, especially when such techniques appear far more promising compared to the cross-examination undertaken, the unused methods are only one factor to be considered."). Rule 804(b)(1) admits prior testimony over a hearsay objection if there was opportunity and similar motive to cross-examine the witness at the prior proceeding. By its terms, applicability of the exception does not turn on whether the opponent actually availed himself of that opportunity. To be sure, that he did not take the opportunity may be one indicator that he lacked a similar motive. *United States v. DiNapoli,* supra. We do not consider it, however, to be a conclusive one.

well as that of Briones and Ramirez at the certification hearing, this seems the more likely pur-

■ The trial court is the institutional arbiter of whether hearsay is admissible under exceptions to the general rule of exclusion of such testimony upon objection under Tex. R.Cr.Evid., Rule 802. Thus, whether evidence comes in under Rule 804(b)(1) is a question for the trial court to resolve, reviewable on appeal only under an abuse of discretion standard. Cf. *Montgomery v. State,* 810 S.W.2d 372, at 390–93 (Tex.Cr.App.1991) (Opinion on rehearing on Court's own motion) (questions of admissibility of evidence under Tex.R.Cr.Evid., Rules 402, 403 and 404(b) are assigned to the trial court, reviewed on appeal only for abuse of discretion). The appellate court should not conduct a *de novo* review; its role is limited to determining whether the record supports the trial court's ruling. Here, the record does indeed support the trial court's ruling that appellant had a motive to cross-examine Walker at the certification hearing that was at least similar to his motive at the punishment phase, for purposes of Rule 804(b)(1). We cannot say, therefore, that the trial court erred to overrule appellant's objection to the admission of Walker's prior testimony.

Accordingly, the judgment of the court of appeals is affirmed.

OVERSTREET, J., concurs in the result.

MALONEY, J., concurs with note: For the reasons stated by me in *Jones v. State,* 843 S.W.2d 487 (Tex.Cr.App.1992), I concur in the judgment of the Court.

CAMPBELL, J., not participating.

BAIRD, Judge, dissenting.

Appellant was convicted of murder and sentenced to forty years confinement. The Court of Appeals affirmed. *Coffin v. State,* No. 08–87–00294–CR (Tex.App.—El Paso, delivered May 23, 1990). We previously granted appellant's petition for discretionary review to determine whether the former testimony of a psychologist at a juvenile transfer hearing was properly admitted at trial

port of the State's question.

under Tex.R.Crim.Evid. 804(b)(1).[1] We remanded to the Court of Appeals to determine whether appellant had a similar motive to cross-examine the psychologist at the juvenile transfer hearing. *Coffin v. State*, No. 1011–90 (Tex.Cr.App. delivered June 24, 1992). On remand, the Court of Appeals held appellant's motive to cross-examine the psychologist at the juvenile transfer hearing was similar to the motive he held at trial. *Coffin v. State*, 850 S.W.2d 608 (Tex.App.— El Paso 1993). Because the majority does not grasp the inherent differences in the purposes for which this testimony was introduced, I respectfully dissent.

## I.

### THE FACTS

Appellant was a juvenile at the time he committed the instant offense. The State petitioned the juvenile court to waive its exclusive jurisdiction and transfer appellant to a district court for criminal proceedings. *See*, Texas Family Code, § 54.02. At the juvenile transfer hearing, Dr. Richard W. Walker, Jr., a clinical psychologist, testified. Walker stated that he examined appellant and conducted several intelligence and psychological tests. Walker determined appellant was intellectually and emotionally capable of understanding the nature of legal proceedings against him and was capable of assisting in his own legal defense. Walker further testified appellant's rehabilitation would be lengthy, requiring a couple of years of extensive residential therapy and follow-up therapy. When appellant cross-examined Walker on the extent of his interview with appellant, Walker admitted his interview with appellant was not extensive, that much of his time involved the administration of psychological tests. When appellant questioned Walker's ability to testify concerning appellant's rehabilitation, Walker answered that appellant would not easily change. The juvenile court waived jurisdiction and trans-

ferred appellant to district court for criminal proceedings.

Walker died prior to trial. At the punishment phase, the State offered Walker's testimony from the juvenile hearing to rebut appellant's application for probation. Appellant objected contending the purpose of the juvenile hearing was different from the punishment phase of the murder trial and that his cross-examination of Walker would be different. The trial judge overruled the objection and admitted Walker's former testimony.

## II.

### A SIMILAR MOTIVE

The former testimony hearsay exception of Rule 804(b)(1) is designed to protect confrontation interests while permitting admission of reliable evidence. To ensure the reliability of such evidence, the party against whom the testimony is offered must have had an opportunity as well as a similar motive to develop the testimony at the time of the earlier testimony. *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Several Supreme Court cases illustrate the opportunity and motive requirement. In *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the complainant testified at an examining trial. Although present, Pointer was not represented by counsel and did not cross-examine the complainant. The Court held the later use of the complainant's testimony violated Pointer's right of confrontation because he was not afforded, through counsel, an adequate opportunity to cross-examine the witness.

In *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), and *Roberts, supra* the Supreme Court upheld the use of former testimony from a preliminary hearing. In *Green*, the Court determined the witness' statement was given under "circumstances closely approximating those that surround the typical trial." *Id.*, 399 U.S. at

1. Rule 804(b)(1) states:
   **Hearsay exceptions.** The following are not excluded if the declarant is unavailable as a witness:
      (1) **Former testimony.** Testimony given as a witness at another hearing of the same or a

different proceeding, if the party against whom the testimony is now offered, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. The use of depositions is controlled by Chapter 39 of the Texas Code of Criminal Procedure.

165, 90 S.Ct. at 1938. The witness was under oath in a judicial proceeding and Green's cross-examination was not limited in the scope or nature of his cross-examination. In *Roberts,* the defendant called a witness at a preliminary hearing to show she had permitted Roberts to use her parents' checks and credit cards. The witness denied giving Roberts permission despite Robert's detailed examination which questioned the witness' denial and the possible reasons for such a denial. Relying on *Green,* the Court "found guarantees of trustworthiness in the accouterments of the preliminary hearing itself." *Roberts,* 448 U.S. at 73, 100 S.Ct. at 2542.

In all three cases the Supreme Court focused on the trial-type conditions of the proceeding, the "accouterments" of trial circumstances. The Court did not discuss the purpose or function of the particular proceeding itself. This is not surprising since the purpose of a preliminary hearing is to determine whether there is probable cause to believe the defendant committed the offense. Therefore, a fairly wide scope of questioning is generally permissible. However, the purpose of a proceeding may sometimes serve to limit the scope of cross-examination. In other words, a more narrow focus may also dictate a narrow motive to question witnesses. *See, Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968) (A preliminary hearing which is limited to a determination of probable cause is ordinarily a "much less searching exploration into the merits.").

We addressed the subsequent use of testimony from a limited-purpose hearing in *Russell v. State,* 604 S.W.2d 914 (Tex.Cr.App. 1980). Although we noted that some examining trials may provide a complete and adequate opportunity to cross-examine a witness, we held the nature of Russell's examining trial, both in practice and as statutorily designed, did not permit a full and complete cross-examination so as to ensure the reliability of the former testimony. *Russell,* 604 S.W.2d at 921. Therefore, we held the materiality of the testimony to the previous hearing, as well as the facts and circumstances in the particular case were determinative. *Id.*

Several other cases demonstrate how the issues raised and the purpose and type of the hearing may affect a determination whether a party had the same or similar motive and opportunity to cross-examine a witness. In *United States v. Taplin,* 954 F.2d 1256 (6th Cir.1992), the prosecutor introduced a co-defendant's testimony from a hearing on Taplin's motion to suppress. The Sixth Circuit held the admission of such testimony violated Rule 804(b)(1) because Taplin did not have a similar motive to cross-examine his co-defendant at the pre-trial hearing. In order for testimony to be admissible at a subsequent proceeding, the proceedings must reflect a "substantial identity of issues." Since the issue at trial was Taplin's involvement in the offense, Taplin had no incentive to develop such testimony from the co-defendant at the pre-trial hearing. At this hearing, the co-defendant's testimony was directed to an issue which did not materially affect Taplin. *Id.,* 954 F.2d at 1259.

In *United States v. Powell,* 894 F.2d 895 (7th Cir.1990), the Seventh Circuit upheld the trial judge's exclusion of former testimony by a co-defendant, given at a plea of guilt, which partially exonerated Powell. The Court held the prosecutor did not have the same motive to cross-examine the co-defendant at the earlier hearing. The prosecutor's interest was to demonstrate the voluntariness of the plea and the underlying factual basis to support it. Thus the prosecutor had no incentive to cross-examine the co-defendant concerning Powell's involvement in the offense. *Id.,* 894 F.2d at 901.

In *Russell, Taplin,* and *Powell,* the purpose of the particular proceeding at which the former testimony was elicited, together with the specific issues relevant to that proceeding, determined whether a similar motive to fully cross-examine the witness existed. Thus, our determination must be made on a case-by-case review.

## III.

### THE FORMER HEARING

The Texas Family Code allows the juvenile court to waive its exclusive original jurisdiction and transfer a child to district court if:

1) the child is alleged to have violated a penal law of the grade of felony;

2) the child was 15 years of age or older at the time he is alleged to have committed the offense and no adjudication hearing has been conducted concerning that offense; and

3) after full investigation and hearing the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense or the background of the child the welfare of the community requires criminal proceedings.

Tex.Fam.Code § 54.02(a). The State must file a petition requesting the juvenile court to waive its exclusive jurisdiction and the child and his parents are entitled to notice of the allegations as well as the time and place of any hearing to be held. Tex.Fam.Code §§ 54.02(b), 53.04, 53.05, 53.06, and 53.07. Prior to any hearing, "the juvenile court shall order and obtain a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense." Tex.Fam. Code 54.02(d).

At the juvenile transfer hearing, the juvenile judge is not constrained by our criminal rules. Tex.Fam.Code § 54.02(e). (Juvenile judge may consider written reports in addition to testimony presented). *See, Matter of D.W.L.,* 828 S.W.2d 520 (Tex.App.—Houston [14th Dist.] 1992) (Juvenile judge may consider hearsay evidence as well as written and oral testimony); *K.W.M. v. State,* 598 S.W.2d 660 (Tex.App.—Houston [14th Dist.] 1980) (Juvenile's Fifth Amendment right against self incrimination is not infringed when a juvenile judge orders a full investigation and diagnostic study or when such is considered at the transfer hearing); *and, A.D.P. v. State,* 646 S.W.2d 568 (Tex.App.—Houston [1st Dist.] 1982) (Juveniles do not have to be warned, prior to court-ordered psychological and clinical testing that they have a right to remain silent and that any statements made may be admissible). This is because the purpose of a juvenile transfer hearing is not to determine the juvenile's guilt or innocence, or punishment, but to determine whether the

interests of the juvenile and society are best served by transferring the case to a district court for criminal proceedings. *In the Matter of Honsaker,* 539 S.W.2d 198 (Tex.App.—Dallas 1976); *and, B.R.D. v. State,* 575 S.W.2d 126 (Tex.App.—Corpus Christi 1979).

At the juvenile transfer hearing, the State's burden is not to prove the juvenile's guilt beyond a reasonable doubt. *Compare, Geesa v. State,* 820 S.W.2d 154 (Tex.Cr.App. 1991). Rather, the State must only "present to the court evidence that will permit the court to exercise its discretion in deciding whether or not to make the transfer to the district court." *Matter of M.I.L.,* 601 S.W.2d 175, 177 (Tex.App.—Corpus Christi 1980). In making this determination the juvenile court shall consider:

(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2) whether the alleged offense was committed in an aggressive and premeditated manner;

(3) whether there is evidence on which a grand jury may be expected to return an indictment;

(4) the sophistication and maturity of the child;

(5) the record and previous history of the child; and

(6) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

Tex.Fam.Code § 54.02(f). Although the juvenile judge must consider each of these factors, the juvenile judge is not required to give equal weight to each factor or even to find that each factor has been established before the case may be transferred to district court. *Matter of C.C.G.,* 805 S.W.2d 10, 15 (Tex.App.—Tyler 1991); *Matter of M.D.B.,* 757 S.W.2d 415, 417 (Tex.App.—Houston [14th Dist.] 1988); *C.W. v. State,* 738 S.W.2d 72, 75 (Tex.App.—Dallas 1987); *and, A.T.S. v. State,* 694 S.W.2d 252, 254 (Tex.App.—Fort Worth 1985). The juvenile judge may, in his discretion, transfer the juvenile to dis-

trict court on the strength of any combination of the § 54.02(f) factors. Finally, if the juvenile judge finds the consideration of the § 54.02(f) factors require the transfer of the juvenile to the district court, this finding will not be reversed absent proof of an abuse of discretion. *Matter of D.W.I.*, 828 S.W.2d 520, 525 (Tex.App.—Houston [14th Dist.] 1992).[2]

## IV.

## DISCUSSION

The underlying policies, procedures, and purposes of a juvenile transfer hearing are dramatically different than a criminal trial. In a juvenile transfer hearing, the juvenile judge's focus is not on the guilt of the juvenile, but on whether the interests of the juvenile and society can be better met by transferring the juvenile to district court for criminal proceedings. *Honsaker*, 539 S.W.2d at 201; *and*, *B.R.D.*, 575 S.W.2d at 131. The State's burden of proof at the juvenile transfer hearing is substantially lower than in a criminal trial. The State must only "present to the court evidence that will permit the court to exercise its discretion...." *Matter of M.I.L.*, 601 S.W.2d at 177. While the majority is correct that the juvenile judge must consider the likelihood of rehabilitation, § 54.02(f)(6), it is only within the context of the juvenile justice system. *Id.* The likelihood of appellant's rehabilitation through the procedures, services and facilities currently available to the criminal justice system *was not an issue.* *Compare*, Tex.Fam.Code § 54.02(f). Therefore, while there is overlap between the issues which are relevant to the punishment phase of a criminal trial and a juvenile transfer hearing, this is only because rehabilitation is always relevant to punish-

ment. *See*, Tex.Penal Code Ann. § 1.02. However, this in no way assumes that appellant had the same motive to question Walker. At the juvenile transfer hearing in the instant case, the relevancy of evidence concerning the likelihood of appellant's rehabilitation was limited to those "procedures, services, and facilities currently available to the juvenile court." § 54.02(f). The record before us does not demonstrate whether our criminal justice system provides the same procedures, services or facilities which were available to the juvenile court. As a result, appellant had no motive to cross-examine Walker concerning appellant's need for "lengthy" rehabilitation and the availability of such rehabilitation within our criminal justice system.[3]

Given the inherent differences between the juvenile system and our criminal justice system, the inapplicability of the constitutional protections guaranteed a defendant, and the statutory limitation on the consideration of rehabilitation at the juvenile transfer hearing, I would hold appellant did not have a similar motive to explore this issue in the way it was used at the punishment phase of his murder trial. Because the majority disagrees, I respectfully dissent.

---

**2.** In *D.W.I.*, the Fourteenth Court of Appeals applied an abuse of discretion standard of review. This is the standard of review we have adopted for most pre-trial proceedings. *See*, *Freeman v. State*, 723 S.W.2d 727, 733 (Tex.Cr. App.1986). However, other courts of appeals have reviewed the juvenile judge's findings under a common civil standard of review: whether the juvenile judge's findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *See*, *Matter of K.D.S.*, 808 S.W.2d 299, 302–303 (Tex.App.—Houston [1st Dist.] 1991).

**3.** I would also note that Walker's testimony concerning the likelihood of appellant's rehabilitation within the juvenile system was but one of the six factors which must be considered by the juvenile judge. This with the other inherent differences between the juvenile system and our criminal justice system may also have directly affected appellant's motivation to cross-examine Walker.