# UNITED STATES *v.* SALERNO ET AL.

No. 91–872. Argued April 20, 1992—Decided June 19, 1992

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 325. STEVENS, J., filed a dissenting opinion, *post*, p. 326.

*James A. Feldman* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Mueller,* and *Deputy Solicitor General Bryson.*

*Michael E. Tigar* argued the cause for respondents. With him on the brief was *Gustave H. Newman.**

JUSTICE THOMAS delivered the opinion of the Court.

Federal Rule of Evidence 804(b)(1) states an exception to the hearsay rule that allows a court, in certain instances, to admit the former testimony of an unavailable witness. We must decide in this case whether the Rule permits a criminal defendant to introduce the grand jury testimony of a witness who asserts the Fifth Amendment privilege at trial.

I

The seven respondents, Anthony Salerno, Vincent DiNapoli, Louis DiNapoli, Nicholas Auletta, Edward Halloran, Alvin O. Chattin, and Aniello Migliore, allegedly took part in the activities of a criminal organization known as the

---

**Jed S. Rakoff* filed a brief for the New York Council of Defense Lawyers as *amicus curiae* urging affirmance.

Genovese Family of La Cosa Nostra (Family) in New York City. In 1987, a federal grand jury in the Southern District of New York indicted the respondents and four others on the basis of these activities. The indictment charged the respondents with a variety of federal offenses, including 41 acts constituting a "pattern of illegal activity" in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. § 1962(b).

Sixteen of the alleged acts involved fraud in the New York construction industry in the 1980's. According to the indictment and evidence later admitted at trial, the Family used its influence over labor unions and its control over the supply of concrete to rig bidding on large construction projects in Manhattan. The Family purportedly allocated contracts for these projects among a so-called "Club" of six concrete companies in exchange for a share of the proceeds.

Much of the case concerned the affairs of the Cedar Park Concrete Construction Corporation (Cedar Park). Two of the owners of this firm, Frederick DeMatteis and Pasquale Bruno, testified before the grand jury under a grant of immunity. In response to questions by the United States, they repeatedly stated that neither they nor Cedar Park had participated in the Club. At trial, however, the United States attempted to show that Cedar Park, in fact, had belonged to the Club by calling two contractors who had taken part in the scheme and by presenting intercepted conversations among the respondents. The United States also introduced documents indicating that the Family had an ownership interest in Cedar Park.

To counter the United States' evidence, the respondents subpoenaed DeMatteis and Bruno as witnesses in the hope that they would provide the same exculpatory testimony that they had presented to the grand jury. When both witnesses invoked their Fifth Amendment privilege against self-incrimination and refused to testify, the respondents asked the District Court to admit the transcripts of their

grand jury testimony. Although this testimony constituted hearsay, see Rule 801(c), the respondents argued that it fell within the hearsay exception in Rule 804(b)(1) for former testimony of unavailable witnesses.

The District Court refused to admit the grand jury testimony. It observed that Rule 804(b)(1) permits admission of former testimony against a party at trial only when that party had a "similar motive to develop the testimony by direct, cross, or redirect examination." The District Court held that the United States did not have this motive, stating that the "motive of a prosecutor in questioning a witness before the grand jury in the investigatory stages of a case is far different from the motive of a prosecutor in conducting the trial." App. to Pet. for Cert. 51a. A jury subsequently convicted the respondents of the RICO counts and other federal offenses.

The United States Court of Appeals for the Second Circuit reversed, holding that the District Court had erred in excluding DeMatteis' and Bruno's grand jury testimony. 937 F. 2d 797 (1991). Although the Court of Appeals recognized that "the government may have had no motive . . . to impeach . . . Bruno or DeMatteis" before the grand jury, it concluded that "the government's motive in examining the witnesses . . . was irrelevant." *Id.,* at 806. The Court of Appeals decided that, in order to maintain "adversarial fairness," Rule 804(b)(1)'s similar motive element should "evaporat[e]" when the Government obtains immunized testimony in a grand jury proceeding from a witness who refuses to testify at trial. *Ibid.* We granted certiorari, 502 U. S. 1056 (1992), and now reverse and remand.

## II

The hearsay rule prohibits admission of certain statements made by a declarant other than while testifying at trial. See Rules 801(c) (hearsay definition), 802 (hearsay rule). The parties acknowledge that the hearsay rule, standing by itself,

would have blocked introduction at trial of DeMatteis' and Bruno's grand jury testimony. Rule 804(b)(1), however, establishes an exception to the hearsay rule for former testimony. This exception provides:

> "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
> "(1) Former Testimony.—Testimony given as a witness at another hearing . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

We must decide whether the Court of Appeals properly interpreted Rule 804(b)(1) in this case.

The parties agree that DeMatteis and Bruno were "unavailable" to the defense as witnesses, provided that they properly invoked the Fifth Amendment privilege and refused to testify. See Rule 804(a)(1). They also agree that DeMatteis' and Bruno's grand jury testimony constituted "testimony given as . . . witness[es] at another hearing." They disagree, however, about whether the "similar motive" requirement in the final clause of Rule 804(b)(1) should have prevented admission of the testimony in this case.

## A

Nothing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of each of the Rule's elements. The United States thus asserts that, unless it had a "similar motive," we must conclude that the District Court properly excluded DeMatteis' and Bruno's testimony as hearsay. The respondents, in contrast, urge us not to read Rule 804(b)(1) in a "slavishly literal fashion." Brief for Respondents 31. They contend that "adversarial fairness" prevents the United States from relying on the similar motive requirement in this case. We agree with the United States.

When Congress enacted the prohibition against admission of hearsay in Rule 802, it placed 24 exceptions in Rule 803 and 5 additional exceptions in Rule 804. Congress thus presumably made a careful judgment as to what hearsay may come into evidence and what may not. To respect its determination, we must enforce the words that it enacted. The respondents, as a result, had no right to introduce DeMatteis' and Bruno's former testimony under Rule 804(b)(1) without showing a "similar motive." This Court cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases. See *Green* v. *Bock Laundry Machine Co.*, 490 U. S. 504, 524 (1989).

The respondents' argument for a different result takes several forms. They first assert that adversarial fairness requires us to infer that Rule 804(b)(1) contains implicit limitations. They observe, for example, that the Advisory Committee Note to Rule 804 makes clear that the former testimony exception applies only to statements made under oath or affirmation, even though the Rule does not state this restriction explicitly. See Advisory Committee's Notes on Fed. Rule Evid. 804, 28 U. S. C. App., p. 788, subd. (b), except. (1). The respondents maintain that we likewise may hold that Rule 804(b)(1) does not require a showing of similar motive in all instances.

The respondents' example does not persuade us to change our reading of Rule 804(b)(1). If the Rule applies only to sworn statements, it does so not because adversarial fairness implies a limitation, but simply because the word "testimony" refers only to statements made under oath or affirmation. See Black's Law Dictionary 1476 (6th ed. 1990). We see no way to interpret the text of Rule 804(b)(1) to mean that defendants sometimes do not have to show "similar motive."

The respondents also assert that courts often depart from the Rules of Evidence to prevent litigants from presenting only part of the truth. For example, citing *United States* v.

*Miller*, 600 F. 2d 498 (CA5 1979), the respondents maintain that, although parties may enjoy various testimonial privileges, they can forfeit these privileges by "opening the door" to certain subjects. In the respondents' view, the United States is attempting to use the hearsay rule like a privilege to keep DeMatteis' and Bruno's grand jury testimony away from the jury. They contend, however, that adversarial fairness requires us to conclude that the United States forfeited its right to object to admission of the testimony when it introduced contradictory evidence about Cedar Park.

This argument also fails. Even assuming that we should treat the hearsay rule like the rules governing testimonial privileges, we would not conclude that a forfeiture occurred here. Parties may forfeit a privilege by exposing privileged evidence, but do not forfeit one merely by taking a position that the evidence might contradict. See 8 J. Wigmore, Evidence § 2327, p. 636 (McNaughton rev. 1961); M. Larkin, Federal Testimonial Privileges § 2.06, pp. 2–103, 2–104, 2–120 (1991). In *Miller*, for example, the court held that a litigant, "after giving the jury his version of a privileged communication, [could not] prevent the cross-examiner from utilizing *the communication itself* to get at the truth." 600 F. 2d, at 501 (emphasis added). In this case, by contrast, the United States never presented to the jury any version of what DeMatteis and Bruno had said in the grand jury proceedings. Instead, it attempted to show Cedar Park's participation in the Club solely through other evidence available to the respondents. The United States never exposed the jury to anything analogous to a "privileged communication." The respondents' argument, accordingly, fails on its own terms.

The respondents finally argue that adversarial fairness may prohibit suppression of exculpatory evidence produced in grand jury proceedings. They note that, when this Court required disclosure of a grand jury transcript in *Dennis* v. *United States*, 384 U. S. 855 (1966), it stated that "it is rarely justifiable for the prosecution to have exclusive access" to

relevant facts. *Id.*, at 873. They allege that the United States nevertheless uses the following tactics to develop evidence in a one-sided manner: If a witness inculpates a defendant during the grand jury proceedings, the United States immunizes him and calls him at trial; however, if the witness exculpates the defendant, as Bruno and DeMatteis each did here, the United States refuses to immunize him and attempts to exclude the testimony as hearsay.* The respondents assert that dispensing with the "similar motive" requirement would limit these tactics.

We again fail to see how we may create an exception to Rule 804(b)(1). The *Dennis* case, unlike this one, did not involve a question about the admissibility of evidence. Rather, it concerned only the need to disclose a transcript to the defendants. See 384 U. S., at 873. Moreover, in *Dennis*, we did not hold that adversarial fairness required the United States to make the grand jury transcript available. Instead, we ordered disclosure under the specific language of Federal Rule of Criminal Procedure 6(e). See 384 U. S., at 869–870, 872. In this case, the language of Rule 804(b)(1) does not support the respondents. Indeed, the respondents specifically ask us to ignore it. Neither *Dennis* nor anything else that the respondents have cited provides us with this authority.

### B

The question remains whether the United States had a "similar motive" in this case. The United States asserts that the District Court specifically found that it did not and that we should not review its factual determinations. It also argues that a prosecutor generally will not have the same motive to develop testimony in grand jury proceedings as he does at trial. A prosecutor, it explains, must maintain

---

*The respondents also suggest that, in the event that a witness chooses to testify at trial without immunity, the United States can impeach him with his grand jury testimony. See Fed. Rules Evid. 607, 801(d)(1)(A).

secrecy during the investigatory stages of the criminal process and therefore may not desire to confront grand jury witnesses with contradictory evidence. It further states that a prosecutor may not know, prior to indictment, which issues will have importance at trial and accordingly may fail to develop grand jury testimony effectively.

The respondents disagree with both of the United States' arguments. They characterize the District Court's ruling as one of law, rather than fact, because the District Court essentially ruled that a prosecutor's motives at trial always differ from his motives in grand jury proceedings. The respondents contend further that the grand jury transcripts in this case actually show that the United States thoroughly attempted to impeach DeMatteis and Bruno. They add that, despite the United States' stated concern about maintaining secrecy, the United States revealed to DeMatteis and Bruno the identity of the major witnesses who testified against them at trial.

The Court of Appeals, as noted, erroneously concluded that the respondents did not have to demonstrate a similar motive in this case to make use of Rule 804(b)(1). It therefore declined to consider fully the arguments now presented by the parties about whether the United States had such a motive. Rather than to address this issue here in the first instance, we think it prudent to remand the case for further consideration. Cf. *Denton* v. *Hernandez*, 504 U. S. 25, 32–35 (1992).

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion with the understanding that it does not pass upon the weighty concerns, expressed by JUSTICE STEVENS, underlying the interpretation of Federal Rule of Evidence 804(b)(1)'s similar-motive requirement. The District Court appeared to hold *as a matter of law* that "the motive of a prosecutor in questioning a witness before

the grand jury in the investigatory stages of a case is far different from the motive of a prosecutor in conducting the trial." App. to Pet. for Cert. 51a. Because "similar motive" does not mean "identical motive," the similar-motive inquiry, in my view, is inherently a *factual* inquiry, depending in part on the similarity of the underlying issues and on the context of the grand jury questioning. It cannot be that the prosecution either *always* or *never* has a similar motive for questioning a particular witness with respect to a particular issue before the grand jury as at trial. Moreover, like other inquiries involving the admission of evidence, the similar-motive inquiry appropriately reflects narrow concerns of ensuring the reliability of evidence admitted at trial—not broad policy concerns favoring either the Government in the conduct of grand jury proceedings or the defendant in overcoming the refusal of other witnesses to testify. Because this case involves factual issues unusual in complexity and in number and because neither the District Court nor the Court of Appeals apparently engaged in the type of factual inquiry appropriate for resolution of the similar-motive inquiry, I join the majority in remanding the case for further consideration.

JUSTICE STEVENS, dissenting.

Because I believe that the Government clearly had an "opportunity and similar motive" to develop by direct or cross-examination the grand jury testimony of Pasquale Bruno and Frederick DeMatteis, I would affirm the judgment of the Court of Appeals on the ground that the transcript of their grand jury testimony was admissible under the plain language of Federal Rule of Evidence 804(b)(1). As the Court explains, *ante*, at 319, the grand jury testimony of Bruno and DeMatteis was totally inconsistent with the Government's theory of the alleged RICO conspiracy to rig bids on large construction projects in Manhattan. Bruno and DeMatteis were principals in Cedar Park Construction Corporation

(Cedar Park), which, according to the Government, was a member of the so-called "Club" of concrete companies that submitted rigged bids on construction projects in accordance with the orders of the Genovese Family of La Cosa Nostra. But notwithstanding the fact that they had been given grants of immunity, Bruno and DeMatteis repeatedly testified before the grand jury that they had not participated in either the Club or the alleged bid-rigging conspiracy. As the Court of Appeals explained, Cedar Park was "one of the largest contractors in the metropolitan New York City concrete industry," and it is arguable that without Cedar Park's participation, "there could be no 'club' of concrete contractors." 937 F. 2d 797, 808 (CA2 1991). And without the "Club," the allegations of fraud in the construction industry—which "formed the core of the RICO charges"—"simply dissolv[e]." *Ibid.*

It is therefore clear that before the grand jury the Government had precisely the same interest in establishing that Bruno's and DeMatteis' testimony was false as it had at trial. Thus, when the prosecutors doubted Bruno's and DeMatteis' veracity before the grand jury—as they most assuredly did—they unquestionably had an "opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" within the meaning of Rule 804(b)(1).[1]

The Government disagrees, asserting that it "typically does not have the same motive to cross-examine hostile witnesses in the grand jury that it has to cross-examine them at trial." Brief for United States 11. This is so, the Gov-

---

[1] Rule 804(b)(1) provides:

"Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former Testimony.—Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

ernment maintains, because (1) cross-examining the witness might indirectly undermine the secrecy of the grand jury proceedings,[2] (2) the Government might decide to discredit the witness through means other than cross-examination, and (3) the issues before the grand jury are typically quite different from those at trial. See *id.*, at 11–14; Reply Brief for United States 9–12. In my view, the first two reasons— even assuming that they are true—do not justify holding that the Government lacks a "similar motive" in the two proceedings. And although the third reason could justify the conclusion that the Government's motives are not "similar," it is not present on the facts of this case.

Even if one does not completely agree with Wigmore's assertion that cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth,"[3] one must admit that in the Anglo-American legal system cross-examination is the principal means of undermining the credibility of a witness whose testimony is false or inaccurate.[4] For that reason, a party has a motive to

---

[2] "If the government exposes the extent of its knowledge to an individual who, by his willingness to commit perjury, has shown himself to be allied with the investigation's targets, the effect may be to provide information to the targets that can be used to threaten witnesses, destroy evidence, fabricate a defense, or otherwise obstruct the investigation." Brief for United States 12.

[3] 5 J. Wigmore, Evidence § 1367, p. 32 (J. Chadbourn rev. 1974).

[4] Indeed, the lack of an opportunity to cross-examine the absent declarant has been the principal justification for the Anglo-American tradition of excluding hearsay statements. See, *e. g.*, E. Cleary, McCormick on Evidence § 245, p. 728 (3d ed. 1984); 5 Wigmore, § 1367, at 32. This concern is diminished, however, when the party against whom the hearsay statement is offered had an opportunity to cross-examine the absent declarant at the time the statement was made. Accordingly, the common law developed an exception to the hearsay rule that permitted the introduction of prior testimony if the opponent had an adequate opportunity to cross-examine the declarant. See, *e. g.*, *id.*, § 1386, at 90. Rule 804(b)(1) codified, with a few changes, that common-law rule. See Advisory Committee's Notes on Fed. Rule Evid. 804(b)(1), 28 U. S. C. App., pp. 788–789.

cross-examine any witness who, in her estimation, is giving false or inaccurate testimony about a fact that is material to the legal question at issue in the proceeding.

Of course, the party might decide—for tactical reasons or otherwise—not to engage in a rigorous cross-examination, or even in any cross-examination at all.[5] In such a case, however, I do not believe that it is accurate to say that the party lacked a similar motive to cross-examine the witness; instead, it is more accurate to say that the party had a similar motive to cross-examine the witness (*i. e.,* to undermine the false or misleading testimony) but chose not to act on that motive. Although the Rules of Evidence allow a party to make that choice about whether to engage in cross-examination, they also provide that she must accept the consequences of that decision—including the possibility that the testimony might be introduced against her in a subsequent proceeding.[6]

Thus neither the fact that the prosecutors might decline to cross-examine a grand jury witness whom they fear will talk to the target of the investigation nor the fact that they

---

[5] For example, the party might not want to run the risk of appearing to harass or upset a vulnerable witness—such as a young child or the victim of a terrible crime—with rigorous cross-examination if there are other, less confrontational means of undermining the suspect testimony.

[6] As the Advisory Committee explained, the question whether prior testimony should be admitted is, in essence, the question "whether fairness allows imposing, upon the party against whom now offered, the handling of a witness on the earlier occasion." *Id.,* at 788. When, as in this case, the testimony is offered against the party by whom it was previously offered, the party obviously did not have an opportunity to develop the testimony through *cross*-examination. But, the Advisory Committee recognized, the opportunity to engage in "direct and redirect examination of one's own witness [is] the equivalent of cross-examining an opponent's witness." *Id.,* at 789. In either case, as long as the party had a similar motive to develop the testimony in the prior proceeding, there is no unfairness in requiring the party against whom the testimony is now offered to accept her prior decision to develop or not develop the testimony fully. *Ibid.*

might choose to undermine the witness' credibility other than through rigorous cross-examination alters the fact that they had an opportunity and similar motive to challenge the allegedly false testimony through questioning before the grand jury. Although those might be reasons for declining to take advantage of the opportunity to cross-examine a witness, neither undermines the principal motive for engaging in cross-examination, *i. e.,* to shake the witness' allegedly false or misleading testimony. Indeed, other courts have found the "opportunity and similar motive" requirement of Rule 804(b)(1) satisfied—and hence the prior testimony admissible in a subsequent trial—in many similar situations.[7]

That leaves the Government's third reason, its contention that it lacks a similar motive to question grand jury wit-

---

[7] See, *e. g., United States* v. *Miller,* 284 U. S. App. D. C. 245, 258, 904 F. 2d 65, 68 (1990) (prior grand jury testimony admissible against the Government because "as several circuits have recognized, the government had the same motive and opportunity to question [the witness] when it brought him before the grand jury as it does at trial. . . . Before the grand jury and at trial, [the witness'] testimony was to be directed to the same issue—the guilt or innocence of [the defendants]"); *United States* v. *Pizarro,* 717 F. 2d 336, 349–350 (CA7 1983) (initial trial testimony of one defendant which exculpated the second defendant was admissible during the retrial of the second defendant even though the Government may have declined to cross-examine the first defendant about an issue for fear that it would have resulted in a severance of the trials of the two defendants); *United States* v. *Poland,* 659 F. 2d 884, 895–896 (CA9) (identification testimony of witness at suppression hearing admissible in subsequent trial because defendant would have a similar motive at both proceedings to show that the identification was unreliable), cert. denied, 454 U. S. 1059 (1981); *Glenn* v. *Dallman,* 635 F. 2d 1183, 1186–1187 (CA6 1980) (identification testimony of eyewitness at preliminary hearing admissible against defendant at trial even though defendant declined to cross-examine the witness fully), cert. denied, 454 U. S. 843 (1981); *United States* v. *Zurosky,* 614 F. 2d 779, 791–793 (CA1 1979) (suppression hearing testimony of codefendant which inculpated defendant admissible against defendant at trial even though defendant declined to cross-examine codefendant at the hearing), cert. denied, 446 U. S. 967 (1980).

nesses because the issues before the grand jury may not be the same issues that are important at trial. If that were true in a particular case, I would agree that the Government lacked a similar motive for developing the witness' grand jury testimony. Because the scope of questioning is necessarily limited by the scope of the legal and factual issues in a given proceeding, a party has little motive, and indeed may not be permitted, to ask questions about other issues. Thus if those other issues become important in a subsequent proceeding, the testimony from the prior proceeding may properly be excluded on the ground that the party against whom it is offered lacked a similar motive for developing the testimony at the prior proceeding.[8]

That did not occur in this case, however. After reviewing the sealed transcripts of Bruno's and DeMatteis' grand jury testimony, the Court of Appeals concluded that "[v]ery generally stated, their grand jury testimony denied any awareness of, let alone participation in," the "Club" of concrete contractors, the existence of which was crucial to the RICO counts dealing with fraud in the construction industry. 937

---

[8] As Wigmore explained, the common law required identity of issues as a means of ensuring that the cross-examination in the two proceedings would have been directed at the same material points. 5 Wigmore, § 1386, at 90. Rule 804(b)(1) slightly modified the prior testimony exception to the hearsay rule by substituting the "opportunity and similar motive" requirement for the identity-of-issues requirement. The drafters of the Rule reasoned that "[s]ince identity of issues is significant only in that it bears on motive and interest in developing fully the testimony of the witness, expressing the matter in the latter terms is preferable." Advisory Committee's Notes on Rule 804(b)(1), at 789. Nevertheless, for the reasons discussed in the text, "[i]n determining whether a similar motive to develop the testimony existed at the time of the elicitation of the former testimony the courts will search for some substantial identity of issues." 11 J. Moore & H. Bendix, Moore's Federal Practice § 804.04[3], p. VIII–266 (2d ed. 1989).

F. 2d, at 808.[9]  Moreover, the transcripts reveal that the prosecutors did challenge some of the witnesses' denials of knowledge of criminal activity by questioning which included probing the basis of their statements and confronting them with contrary statements from other people.

I am therefore satisfied that the Government had an "opportunity and similar motive" to develop the grand jury testimony of witnesses Bruno and DeMatteis; consequently, the transcript of that testimony was admissible against the Government at respondents' trial under Rule 804(b)(1).  For that reason, I would affirm the judgment of the Court of Appeals.

---

[9] "Indeed," the Court of Appeals explained, "the central importance of the 'club's' existence is probably why the government felt obligated to identify Bruno and DeMatteis as sources of exculpatory testimony under *Brady* v. *Maryland*[, 373 U. S. 83 (1963)]."  937 F. 2d, at 808.