United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 1, 1998 Decided November 3, 1998 

 No. 96-3128

 United States of America, 

 Appellee

 v.

 Melvin L. Lampkin, 

 Appellant

 Consolidated with 

 96-3129

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 96cr00103-01) 

 (No. 96cr00103-02)

 Lisa B. Wright, Assistant Federal Public Defender, argued 
the cause for appellant, with whom A. J. Kramer, Federal 
Public Defender, was on the briefs.


 Richard E. Gardiner, appointed by the court, was on the 
brief for appellant Troy E. Lampkin.

 Kimberley S. Knowles, Assistant U.S. Attorney, argued the 
cause for appellee, with whom Wilma A. Lewis, U.S. Attor-
ney, John R. Fisher, Thomas C. Black and T. Anthony 
Quinn, Assistant U.S. Attorneys, were on the brief. Mary-
Patrice Brown and M. Evan Corcoran, Assistant U.S. Attor-
neys, entered appearances.

 Before: Edwards, Chief Judge, Henderson and Garland, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: On March 5, 1996, pursuant to a 
search warrant, police officers searched an apartment at 1962 
West Virginia Avenue, N.E., in the District of Columbia. At 
the time of the search, there were three adults (appellants 
Melvin Lampkin and Troy Lampkin, and Thomas Davenport) 
and five juveniles (Michael Thomas, Anthony Millhouse, La-
von Howard, Kellie Mitchell, and Catherine Pledger) in the 
apartment. The search uncovered ziplock bags of cocaine 
base on a table and hidden in a ceiling light fixture, and a 
pistol hidden in a chair cushion. Subsequently, an indictment 
was returned, charging both Melvin and Troy Lampkin with 
possession with intent to distribute more than 5 grams of 
cocaine base ("PWID"), in violation of 21 U.S.C. s 841(a)(1) 
and (b)(1)(B)(iii) [Count One], and employing a minor to 
commit the same drug offenses, in violation of 21 U.S.C. 
s 861(a)(1) [Count Three]; Melvin Lampkin, alone, was 
charged with carrying a firearm during a drug trafficking 
offense [Count Two], carrying a pistol without a license 
[Count Four], and possession of unregistered ammunition 
[Count Five]. Following trial on these counts, a jury convict-
ed both Lampkins on Counts One and Three; however, 
Melvin Lampkin was acquitted on Counts Two, Four, and 
Five.

 Appellants seek to overturn their convictions on a number 
of grounds, only three of which raise substantial questions for 
consideration by this court. Appellants claim that the trial 


judge erred (i) in repeatedly instructing the jury that three 
juvenile witnesses who testified against the Lampkins could 
not face prosecution in federal court, (ii) in allowing the jury 
to consider video-taped evidence that was never presented in 
open court or subjected to cross-examination, and (iii) in 
admitting a prior consistent statement of a key Government 
witness. Appellants also claim that the trial judge erred in 
imposing a special assessment of $100, rather than $50, for 
each of appellants' convictions. The Government concedes 
that we must remand the special assessment to allow the trial 
court to impose the correct amount. The Government also 
concedes error on the first three points, but argues that each 
error is harmless.

 After careful review of the record in this case, we find that 
the first two errors at issue require the reversal of both 
appellants' convictions on Count Three, as well as Troy 
Lampkin's conviction on Count One. The errors were harm-
less, however, with respect to Melvin Lampkin's conviction on 
Count One, because there was ample independent evidence 
linking him to the drugs. As for the third cited error, we 
agree with the Government that it was harmless error for the 
District Court to admit a prior consistent statement of Kellie 
Mitchell, because the statement was merely cumulative of 
other evidence adduced at trial.

 I. Background

 A.The Arrest and Indictment

 On March 5, 1996, three members of the Metropolitan 
Police Department executed a search warrant in an apart-
ment at 1962 West Virginia Avenue, N.E., in the District of 
Columbia. Inside, the police found eight people, 2.3 grams of 
cocaine base in 16 ziplock bags on a table, 31 grams of cocaine 
base in 202 ziplock bags hidden in a ceiling light fixture, and a 
pistol hidden in the cushion of a chair. Of the eight people in 
the apartment, three were adults--appellants Melvin and 
Troy Lampkin, as well as Thomas Davenport--and five were 
juveniles--Michael Thomas, Anthony Millhouse, Kellie Mitch-
ell, Lavon Howard, and Catherine Pledger. The police also 


found keys to the apartment in Melvin Lampkin's jacket, as 
well as Melvin Lampkin's car registration on the same table 
as the 16 ziplock bags. They also found $231 in cash in Troy 
Lampkin's pants pocket.

 The police arrested the adults and brought the juveniles in 
for questioning. That night, the police conducted video-taped 
interviews of the juveniles. Upon examination, Michael 
Thomas's fingerprints were found on the clip of the gun and 
Lavon Howard's fingerprints were found on the light fixture. 
No fingerprints from Melvin or Troy Lampkin were found on 
either the gun or the drugs.

 On April 2, 1996, the Lampkins were charged with PWID 
and employing a minor to commit the drug offenses. Melvin 
Lampkin was also charged with three gun and ammunition 
possession offenses. The juveniles were not charged with 
any offenses.

 B.The Trial

 Melvin and Troy Lampkin were tried together, in a trial 
commencing on June 25, 1996. During the trial, the building 
landlord testified that he had rented the searched apartment 
to Melvin Lampkin, and the police officers testified as to the 
items found in the apartment. The heart of the Govern-
ment's case, however, was the testimony of three of the 
juveniles: Thomas (age 17), Millhouse (age 14), and Mitchell 
(age 15). Thomas and Millhouse testified that they had sold 
drugs for the Lampkins in the past, and that the Lampkins 
kept the drugs in the light fixture. Millhouse also testified 
that, on the night of the search, he had seen Melvin Lampkin 
with a gun. Mitchell testified that she saw Melvin reach into 
the light fixture that night and give Troy some cocaine to sell 
to a customer waiting at the door. She also testified that she 
saw Melvin Lampkin remove a gun from his waistband and 
place it under a pillow on the couch.

 The credibility of the juvenile witnesses was suspect, to say 
the least. Thomas, in particular, seemed to have difficulty 
understanding most of the questions asked of him, his an-
swers were often vague and unresponsive, the prosecutor led 


him on a number of occasions, and his answers to most of the 
central questions about the drugs and the gun changed after 
his recollection was refreshed by reference to the testimony 
that he had given before the grand jury. Millhouse testified 
that he had been smoking marijuana on the night of the 
search and that he did not have a good memory of the events 
of that night. Mitchell admitted that she had been smoking 
marijuana on the night of the search, that during her initial 
police interview she said she did not know if Melvin Lampkin 
sold drugs, and that during this interview she said it was 
Thomas, not Melvin Lampkin, who had taken drugs from the 
light fixture that night.

1.The Erroneous Instruction

 During the cross-examination of Thomas, defense counsel 
attempted to show that Thomas had a deal with the prosecu-
tor, pursuant to which he would escape prosecution in ex-
change for testifying against the Lampkins. See Trial Tran-
script ("Tr."), 6/26/96 at 209-11. In response to questions 
from defense counsel, Thomas appeared to indicate that he 
had been told by a prosecutor that he was not being charged 
because he was testifying against the Lampkins. See id. at 
210-11. However, at a bench conference during cross-
examination, the trial judge made it clear to counsel that his 
line of inquiry was pointless. The court instructed counsel 
that

 it is only fair, and it becomes more and more fair as we 
 go, to make it abundantly clear to this jury that the 
 United States [Attorney's Office] does not have jurisdic-
 tion [over the juvenile witnesses], that's why I wanted to 
 say it at first and that's why I wanted to say it for every 
 juvenile.

Id. at 218-19. Then, immediately following Thomas's testi-
mony, the court instructed the jury as follows:

 Members of the Jury, you have heard the testimony of 
 Mr. Michael Thomas, who is a juvenile, providing testi-
 mony on behalf of the Government.... You are in-
 structed that it is the District of Columbia Corporation 


 Counsel that has the authority, the jurisdiction, to decide 
 whether to proceed with any charges against a juvenile. 
 The United States Attorney and his Assistant United 
 States Attorney, such as the Assistant United States 
 Attorney in this case, has no such authority.... A 
 supervisor at the District of Columbia Corporation Coun-
 sel has ... indicated there will be no prosecution of Mr. 
 Thomas as a juvenile arising from the events of [March 
 5, 1996].

Tr. 6/27/96 at 77-78.

 At the conclusion of Millhouse's testimony, the District 
Court told the jury that the same instruction applied to 
Millhouse. See Tr. 6/27/96 at 143. Defense counsel then 
brought to the court's attention the fact that under 18 U.S.C. 
s 5032, the U.S. Attorney's Office did in fact have jurisdiction 
to prosecute the juveniles. The court acknowledged the 
error, but nevertheless repeated the instruction, over defense 
objection, in its final charge to the jury. See Tr. 7/2/96 at 6A-
11.

2.The Thomas Video Tape

 Early in the trial, the Government offered into evidence the 
video tape of the police interviews of the three juveniles made 
on the night of the arrests. Defense counsel objected, claim-
ing that admission of the tape would violate the Confrontation 
Clause. See Tr. 6/26/96 at 41. The trial judge admitted the 
tape over counsel's objection. Subsequently, Government 
counsel attempted to rehabilitate Thomas on re-direct by 
playing the portion of Thomas's video-taped interview in 
which he said that he retrieved drugs from the light fixture at 
the request of Troy Lampkin. See Tr. 6/27/96 at 73. Over 
defense counsel's objections, the District Court allowed the 
Government to play a portion of the tape.

 It appears that approximately three minutes of Thomas's 
statement were actually played during trial, see id. at 69, an 
amount that Government counsel recalls as "only a short 
segment" of the total interview. Brief for Appellee at 40 
n.12. Subsequently, however, in the middle of its delibera-


tions, the jury sent a note to the trial court asking for the 
video tape of the police interviews and the transcript of each 
of the juveniles' trial testimony. The trial court informed the 
jury that the trial transcript was unavailable; but the trial 
judge gave the jury the entire video tape to play in the jury 
room, including the portion of the Thomas statement that was 
never played in court. Government counsel conceded that it 
was error for the District Court to allow the jury to hear and 
consider the entire video-taped statement.

3.Mitchell's Prior Consistent Statement

 On cross-examination, Mitchell was impeached with her 
statement to the police that it was Michael Thomas, not 
Melvin Lampkin, who had retrieved drugs from the light 
fixture during the night in question. On re-direct, the Gov-
ernment elicited from Mitchell, over objection, that she had 
told the grand jury that it was Melvin Lampkin who had 
retrieved the drugs from the light. See Tr. 6/28/96 a.m. at 76. 
The Government concedes that admission of this prior consis-
tent statement was error.

4.The Special Assessment

 On July 8, 1996, the jury returned guilty verdicts against 
both Lampkins for PWID and for employing a minor to 
commit the drug offenses. The jury acquitted Melvin Lamp-
kin of the gun and ammunition possession charges. The 
District Court imposed a special assessment of $100 for each 
of appellants' convictions.

 II. Analysis

 A.The Erroneous Instruction

 All parties agree that the District Court's repeated instruc-
tions to the jury that the United States did not have jurisdic-
tion to prosecute the juvenile witnesses was an erroneous 
statement of the law. See 18 U.S.C. s 5032 (Supp. II 1996) 
(establishing procedures for federal prosecution of juveniles). 
Therefore, we must determine whether this conceded error 
requires reversal. To do so, we look to the proceedings as a 
whole and reverse only if the error "undermine[s] confidence 


in the conviction when viewed in light of all that took place." 
United States v. Yunis, 924 F.2d 1086, 1096 (D.C. Cir. 1991). 
If the error "had substantial and injurious effect or influence 
in determining the jury's verdict," it cannot be viewed as 
harmless. Kotteakos v. United States, 328 U.S. 750, 776 
(1946).

 The trial judge gave the erroneous instruction three times: 
once following Thomas's testimony, once when the judge told 
the jury that the instruction applied to Millhouse's testimony, 
and once in the court's final charge (after the trial judge had 
been advised by counsel that the instruction was legally in 
error). The prejudice from the error is arguably mitigated 
somewhat by the fact that the United States Attorney rarely 
exercises its jurisdiction over juveniles. Nonetheless, there 
was no good reason for the District Court to offer any 
instruction on this matter, much less sua sponte. It goes 
without saying that the trial judge certainly would not have 
advised the jury on the frequency with which the United 
States makes deals with cooperating witnesses, for such an 
instruction would not be in the Government's interest and it 
would offer the jury little, if any, relevant information. So we 
are not here pondering whether the erroneous instruction 
that was given was close to something that the trial judge 
might reasonably have given to the jury. Rather, we are 
considering an instruction that was clearly wrong with re-
spect to a matter that should not have been before the jury.

 The most important point to be made here is that the trial 
judge's erroneous instruction robbed the appellants of their 
primary defense. The defendants wanted to show that the 
principal witnesses against them testified only to escape 
prosecution themselves, and thus that they lied with good 
motive to do so. The defendants were improperly foreclosed 
from pursuing this line of defense. In United States v. 
Salerno, 937 F.2d 797, 809-10 (2d Cir. 1991), the trial judge 
refused to allow the defendant to cross-examine key Govern-
ment witnesses on the issue of bias, and then refused to allow 
him to raise the issue when presenting his own case. The 
court held:


 This was not a harmless error. By instructing Ianniello 
 to wait to make the bias inquiry, and then refusing to 
 allow it, the district court effectively prevented Ianniello 
 from presenting a defense. This was an error of consti-
 tutional magnitude. The Supreme Court has long held 
 that criminal defendants have, at a minimum, "the right 
 to put before a jury evidence that might influence the 
 determination of guilt." Pennsylvania v. Ritchie, 480 
 U.S. 39, 56 (1987). See also Chambers v. Mississippi, 410 
 U.S. 284 (1973).... 

Id. at 810, rev'd on other grounds, 505 U.S. 317 (1992).1 We 
think that the holding in Salerno is precisely on point here: if 
a trial court commits error and thereby prevents a defendant 
from presenting a viable defense, that error is not harmless.

 The Government emphasizes that Michael Thomas ap-
peared to believe that he had been offered a deal in exchange 
for his testimony. As long as Thomas had the subjective 
belief that he had made a deal to cooperate, and he was 
vigorously cross-examined on the subject, the Government 
argues, the court's erroneous instruction did nothing to bol-
ster his credibility and was therefore harmless error. We 
disagree.

 The erroneous instruction followed immediately after 
Thomas's confused testimony, then the instruction was re-
peated twice more. Indeed, the trial court carried out its 
stated desire to make it "abundantly clear" to the jury that 
the United States could not prosecute Thomas or any of the 
juvenile witnesses. Furthermore, even if Thomas thought he 
had made a deal with the Government (and his testimony is 
very confusing on this point), Millhouse and Mitchell testified 

__________
 1 Ianniello's convictions, along with those of his seven co-
defendants, were also reversed on an entirely unrelated ground. 
The Supreme Court subsequently reversed the Second Circuit on 
this unrelated ground. See United States v. Salerno, 505 U.S. 317 
(1992). The Second Circuit's holding as to Ianniello's inability to 
present a defense, however, remained intact; Ianniello was subse-
quently severed from the case. See United States v. Salerno, 974 
F.2d 231, 232 (2d Cir. 1992).


to no such thing. It is true that defense counsel decided not 
to cross-examine Millhouse on agreements to cooperate and 
only briefly cross-examined Mitchell on the subject. But the 
decision to forego this line of cross-examination was certainly 
reasonable, given that the District Court had made it abso-
lutely clear that it was going to impress upon the jury the 
"fact" that the United States did not have jurisdiction to 
prosecute the juveniles. In short, the jurors were given the 
clear view that the juveniles could not be prosecuted by the 
Government. The result was that the defendants were effec-
tively foreclosed from attempting to show that the juveniles 
had a strong motive to testify on behalf of the Government 
and against the Lampkins.

 Under these circumstances, there is a real possibility that 
the instruction had a substantial effect on the jury's verdict 
with respect to the Lampkins' convictions for unlawfully 
employing a minor. See Kotteakos, 328 U.S. at 765. The 
evidence against the Lampkins on this charge was far from 
overwhelming, given that the credibility of the juveniles was 
very much in doubt throughout the trial. The jurors appar-
ently did not believe Millhouse's and Mitchell's testimony 
regarding Melvin Lampkin's possession of the gun, for they 
acquitted him of the gun charges. Thomas's testimony was 
even more suspect. At one point during his testimony, the 
trial court even asked him if he had been high on marijuana 
during his testimony the previous day. See Tr. 6/27/96 at 13. 
Absent the juveniles' testimony--tainted by conceded error--
that they sold drugs for the Lampkins, there was literally no 
evidence to convict appellants of this offense.

 We need not decide whether this error without more 
warrants reversal. Rather, we find that, when the erroneous 
instruction is considered along with the trial court's error in 
allowing the jury to consider video-taped evidence that was 
never presented in open court or subjected to cross-
examination, there is no doubt that reversible error was 
committed. Accordingly, both Lampkins' convictions for un-
lawfully employing a minor must be reversed. See United 
States v. Smart, 98 F.3d 1379, 1391 (D.C. Cir. 1996) ("[I]f the 


evidence presented at trial is ambiguous, even a relatively 
minor error requires reversal.").

 Troy Lampkin's PWID conviction must be reversed for the 
same reason. The only evidence, other than the juveniles' 
testimony, offered against him on this count was the fact that 
he was in the apartment at the time of the search and $231 in 
cash was found on his person. This evidence would not have 
been sufficient to convict Troy Lampkin on Count One. See, 
e.g., United States v. Foster, 783 F.2d 1087, 1089 (D.C. Cir. 
1986) ("Numerous decisions of this Circuit have made clear 
that mere proximity or accessibility to contraband will not 
support a conclusion that an individual had knowing dominion 
and control over it."); United States v. Pardo, 636 F.2d 535, 
549 (D.C. Cir. 1980) (same).

 We decline, however, to reverse Melvin Lampkin's PWID 
conviction. Apart from the juveniles' testimony, there was 
ample circumstantial evidence of Melvin's dominion and con-
trol over the apartment and the drugs inside: the testimony 
of the landlord that Melvin Lampkin had rented the apart-
ment and lived there; the discovery of the apartment keys in 
his jacket and of his car registration on the table; and the 
presence of the ziplock bags both in plain view on the table 
and in the light fixture. Given this independent evidence, we 
are satisfied that the erroneous instruction did not have a 
substantial effect on the jury's verdict against Melvin Lamp-
kin on Count One.

 B.The Thomas Video Tape

 Throughout the trial, defense counsel strongly objected to 
the admission of the video tape of the police interviews of the 
juveniles, on both Confrontation Clause and hearsay grounds. 
See Tr. 6/26/96 at 41; 6/27/96 at 68, 74. Reasonably con-
strued, these objections encompass the original admission of 
the tape, the playing of small segments of the tape for the 
jury during the course of trial, and the release of the entire 
tape to the jury for its review and consideration during jury 
deliberations. Indeed, during oral argument before this 
court, Government counsel conceded that it was error for the 
District Court to allow the jury access to the entire video-
taped police statement of Michael Thomas, when only a brief 
portion of the statement was subjected to cross-examination 


in court. We agree. The only question here is whether the 
error was harmless.

 "To protect jury deliberations from improper influence, we 
ordinarily restrict the jury's access only to exhibits that have 
been accepted into evidence and 'consideration by the jury of 
documents not in evidence is error.' " United States v. 
Holton, 116 F.3d 1536, 1542 (D.C. Cir. 1997) (citation omit-
ted); see also Turner v. Louisiana, 379 U.S. 466, 472-73 
(1965) ("[T]rial by jury in a criminal case necessarily implies 
at the very least that the 'evidence developed' against a 
defendant shall come from the witness stand in a public 
courtroom where there is full judicial protection of the defen-
dant's right of confrontation, of cross-examination, and of 
counsel."); United States v. Cunningham, 145 F.3d 1385, 
1397 (D.C. Cir. 1998) (reversing convictions where jury was 
inadvertently provided with unredacted 911 tapes implicating 
appellant). The precise content of the unconfronted portion 
of Thomas's statement is not clear from the record; it is 
clear, however, that the disputed amount of tape that was 
made available to the jury was not an insignificant portion of 
the tape, because the Government acknowledges that only a 
minor segment of Thomas's taped statement was played for 
the jury in open court. It is also clear that the jury had a 
great interest in reviewing the testimony of the juveniles--
during its deliberations, the jury asked for all of the juveniles' 
testimony, but received only the video tape.

 The burden is on the Government to establish that the 
unconfronted portions of the tape given to the jury were not 
prejudicial, i.e., that the error was harmless. See Smart, 98 
F.3d at 1390; Kotteakos, 328 U.S. at 760-61. In the seminal 
Turner case, two key Government witnesses acted as deputy 
sheriffs in charge of the jury throughout the trial. There was 
no showing that the deputies discussed the case with the jury 
members, but the Court noted that the deputies' testimony at 
trial was central to the Government's case, and their credibili-
ty was "assailed" on cross-examination. Turner, 379 U.S. at 
473. The Court reversed the convictions, explaining that 
"[t]he requirement that a jury's verdict 'must be based upon 
the evidence developed at the trial' goes to the fundamental 


integrity of all that is embraced in the constitutional concept 
of trial by jury." Id. at 472 (citation omitted). Thus, under 
Turner, when evidence that directly pertains to the case has 
not been subjected to cross-examination but is nevertheless 
submitted to the jury, reversal is required unless the Govern-
ment can show that the evidence did not prejudice the 
defendant.

 With respect to Troy Lampkin's PWID conviction, the 
Government offers nothing to suggest that the conceded error 
was other than prejudicial. No one doubts that the uncon-
fronted portions of the video-taped statement were directly 
relevant to the case. We know from the portion that was 
played in court that Thomas's statement strongly implicated 
Troy Lampkin. Furthermore, the Government conceded at 
oral argument that Thomas had not yet been informed that 
he was not going to be prosecuted at the time when he was 
interviewed. Finally, there seems little doubt that the jury 
reviewed the video tape, for the jury asked for all of the 
juveniles' testimony (but received only the video tape to 
review). On these facts, we cannot assume that the Govern-
ment has met its burden. Rather, we must suppose that an 
error of this magnitude--jury exposure to unconfronted 
statements from a principal prosecution witness--is prejudi-
cial unless the Government shows otherwise. The Govern-
ment has shown nothing to support its claim of harmless 
error.

 We very recently reiterated that in a harmless error inqui-
ry, "[t]he question is 'whether the guilty verdict actually 
rendered in this trial was surely unattributable to the error' " 
and not whether the appellant would have been convicted but 
for the error. United States v. Maddox, No. 97-3082, slip op. 
at 7 (D.C. Cir. Oct. 9, 1998) (quoting Sullivan v. Louisiana, 
508 U.S. 275, 279 (1993)). "If the judge is in 'grave doubt' 
about the harmlessness of the error, he or she must reverse 
the conviction." Smart, 98 F.3d at 1390 (quoting O'Neal v. 
McAninch, 513 U.S. 432, 436 (1995)). Particularly with re-
spect to a witness like Thomas, who was effectively im-
peached on cross-examination, we cannot say that under 
these circumstances it was harmless error for the jury to 


have unlimited access to Thomas's video-taped statement 
about which he was never cross-examined. And, as noted 
above, when this error is considered along with the erroneous 
instruction, there is no doubt that reversible error was com-
mitted. Accordingly, we reverse Troy Lampkin's PWID con-
viction.

 There is no basis, however, for us to reverse Melvin 
Lampkin's PWID conviction. As discussed above, there was 
ample independent evidence linking Melvin to the drugs such 
that we can say with fair assurance that the error here did 
not affect the jury's verdict against him.

 C.Mitchell's Prior Consistent Statement

 Mitchell testified on direct examination that she had seen 
Melvin Lampkin take drugs out of the light fixture on the 
night of the search. She was impeached on cross-
examination with her statement to the police that it was 
Thomas, not Melvin Lampkin, who had taken the drugs out of 
the fixture that night. The District Court then allowed the 
Government to elicit on re-direct Mitchell's grand jury testi-
mony that she saw Melvin take drugs out of the light fixture 
on the night of the search and give them to Troy. Tr. 6/28/96 
a.m. at 76. The Government concedes that this testimony 
was inadmissible hearsay that improperly bolstered Mitchell's 
direct testimony.

 We find that this error was harmless in light of the strong 
circumstantial case against Melvin discussed above, the trial 
testimony of Thomas that the light fixture was a "stash spot" 
and that he had seen Melvin remove drugs from it, and 
Millhouse's testimony that the Lampkins kept drugs in the 
fixture and that he had seen Melvin "serve" drugs from the 
apartment on the day of the search. In other words, we are 
confident that Mitchell's prior consistent statement, which 
was merely cumulative of other evidence adduced at trial, did 
not affect the jury's verdict. See Kotteakos, 328 U.S. at 776.

 D.The Special Assessment

 Pursuant to 18 U.S.C. s 3013, appellants should have been 
charged a special assessment of $50 for each of their convic-


tions. However, the District Court imposed a special assess-
ment of $100 for each conviction, apparently pursuant to a 
recent amendment to s 3013 increasing the mandatory spe-
cial assessment for felony convictions. See Mandatory Vic-
tims Restitution Act of 1996, Pub. L. No. 104-132, tit. II, 
s 210, 110 Stat. 1214, 1240 (1996). The Government concedes 
that the amendment was passed subsequent to the date of the 
offense and that a remand is therefore necessary in order to 
impose the appropriate special assessment of $50 per convic-
tion. See United States v. Grace, 778 F.2d 818, 823 (D.C. Cir. 
1985). Because we affirm Melvin Lampkin's PWID convic-
tion, we remand for the purpose of adjusting the special 
assessment on this conviction to accord with the pre-
amendment version of 18 U.S.C. s 3013.

 III. Conclusion

 For the reasons explained above, we reverse Troy Lamp-
kin's convictions on Count One and Count Three. We also 
reverse Melvin Lampkin's conviction on Count Three. We 
affirm Melvin Lampkin's conviction on Count One, but re-
mand to the sentencing court for imposition of the appropri-
ate special assessment. The reversed counts are remanded 
for new trial.

 So ordered.