In accordance with the memorandum opinion filed herewith,

**IT IS HEREBY ORDERED** that the final decision of the defendant Commissioner of Social Security denying disability benefits to plaintiff Randall Boyd is reversed. This action is remanded to the defendant under Sentence 4 of 42 U.S.C. § 405(g) for further proceedings. Consistent with the opinion of the court, upon remand, the Commissioner shall reconsider plaintiff's claim and make specific supplemental findings regarding the opinions of the medical sources.

**UNITED STATES of America,
Respondent,**

v.

**Tony E. EMERY, Movant.**

**Nos. 01–6005–CV–W–HFS, CR. 97–6004–01–CR–W–HFS.**

United States District Court,
W.D. Missouri,
Western Division.

April 18, 2003.

Tony E. Emery, Leavenworth, KS, Pro se.

Don Michael Green, U.S. Attorney's Office, Kansas City, MO, for United States.

### MEMORANDUM AND ORDER

SACHS, District Judge.

Movant Tony Emery seeks relief under 28 U.S.C. § 2255 from his conviction of killing a federal witness and from the life sentence imposed. On direct appeal the judgment was affirmed. *United States v. Emery*, 186 F.3d 921 (8th Cir.1999). A massive filing, with massive attachments, has been made by Emery, and the Government has responded with bulky filings.

After reviewing the filings I conclude that relief should be denied, for reasons developed at length by the Government. Rather than simply rephrase the prosecution briefing, with slight modification and elaboration, I conclude that, for the most part, I should adopt the briefing by the Government. Docs. 13, 27. I will, however, deal more independently with three issues that would most nearly justify appellate review. All three are *Strickland*, issues, governed by the familiar doctrines of that case.[1]

Emery contends that appellate counsel was ineffective in failing to pursue an ex post facto contention that can arguably be posed with respect to an evidentiary rule

---

1. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

change, occurring after the murder in 1990, that authorized use of statements by the victim, Christine Elkins, tending to incriminate him. Doc. 9, page 131. He also contends (after some prompting) that there was ineffective assistance of trial counsel in failing to seek a new trial, based on two post-trial signed statements of another inmate, Sidney Griffin, claiming that Emery's cousin, Herbert Emery, hereinafter referred to as Tug, admitted to him some months before trial that he would falsely implicate Emery through testimony of an alleged admission by Emery that Emery had himself struck the final blows killing Ms. Elkins, in the basement of the house where the killing occurred. Instead, "Tug" is said to have confessed that he struck the final blows (as well as the first blows at the top of the stairs). Doc. 9, page 174.[2] The final point that will be considered is whether there was a *Brady* violation in nondisclosure of the contents of grand jury testimony by Ronald Coy, who was supposedly with Emery in the basement at the time of the killing.[3] Another version of the Coy problem would have it that counsel was ineffective in failing to call Coy as a witness or at least to offer his grand jury testimony. Doc. 9, page 192.

The basic trial proof, as recited by the Circuit on direct appeal, was that

"(e)xtensive testimony was offered at trial that Mr. Emery recruited others to help him kill Ms. Elkins, that they discussed the plan for the murder as well as various options for the disposal of the body, that Mr. Emery lured Ms. Elkins into a house and prevented her from leaving while another man beat her, that Mr. Emery beat her in the head with a flashlight while another man held her, and that Mr. Emery disposed of her body by sinking her and her car in the Missouri River."

*Emery,* supra, 186 F.3d at 927. The trial testimony, now partially impeached, was that Emery initially joined Tug and the victim at the top of the stairs, that Tug struck her there and caused her to fall down the steps to the basement, that Tug and another witness, Miller, fled the scene before the final blows were struck in the basement, and that Emery later acknowledged to Tug that he and Coy had subsequently gone to the basement where Emery struck the final blows.[4]

Pertinent to the remaining issues is the court's instruction, approved on appeal, that "two or more persons may kill an individual when they actively participate with each other in a killing... when the assaults are made with the intent to kill, even if you are unable to determine who struck the fatal blow." 186 F.3d at 927. Trial counsel considered this instruction made it immaterial whether Emery or Tug struck the fatal blow, and therefore a new trial motion was not necessarily called for when the report was received that Tug had reportedly assumed more blame. As noted below, I agree.

## I.

■ As discussed on appeal, a significant evidentiary issue was whether certain statements of the victim, showing alarm that Emery might consider her an infor-

---

**2.** The new trial issue is implicit as recognized by the Government. Doc. 13, page 35. I accepted it as such in my order of June 19, 2002.

**3.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**4.** In fairness to the prosecutor's case it may be added that grand jury testimony of Coy's has now been filed by me, which seems somewhat supportive of the trial testimony in that Emery supposedly acknowledged to Coy that Tug and Miller had fled, arguably before the last blows were struck.

mant, could be admitted into evidence after her death. The evidence served to confirm motivation for the crime, and strongly tended to identify Emery as the likely killer (or at least the person most likely to make arrangements for the murder). The statements were admitted into evidence under the current hearsay exception contained in Rule 804(b)(6). The hearsay exception relied on was adopted in 1997, some seven years after the murder. The appellate decision affirms this court's handling of the evidence under the 1997 amendment. It does not discuss an ex post facto problem. The issue cannot be considered on the merits at this late date, except through a theory that appellate counsel was ineffective in not making it an issue on appeal.

The simple answer is that the amendment was procedural in nature, and could properly be applied to events that occurred prior to its adoption. If the ex post facto contention is unsound, failure to pursue it was obviously good lawyering rather than the reverse.

Movant relies on *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000), where the Supreme Court majority struck down use of a reduced quantum of evidence required to convict, adopted subsequent to the crime. But the Court noted that a change in witness competency rules after the event being litigated is treated as a procedural change not subject to challenge as an ex post facto violation. 529 U.S. at 542–47, 120 S.Ct. 1620.

The case at bar is not completely answered in the *Carmell* distinction, however, because the majority does note that a rule change that always favors the prosecution approaches the unfairness issue posed by ex post facto analysis. 529 U.S. at 546, 120 S.Ct. 1620. The amendment here does, by definition, adversely affect one party, a criminal defendant. While this does make the issue somewhat more difficult, I am reasonably satisfied that a change in a competency rule has been and will be classified as relating "to modes of procedure only in which no one can be said to have a vested right..." *Hopt v. Territory of Utah*, 110 U.S. 574, 590, 4 S.Ct. 202, 28 L.Ed. 262 (1884). The Tenth Circuit so ruled in *Neill v. Gibson*, 278 F.3d 1044, 1052–3 (2001), where it sustained use of victim impact testimony in a death penalty case, although the use of such testimony was authorized during the pendency of the prosecution, and the court acknowledged that it is always helpful to the prosecution.

As the Government also points out, the addition of a textual change in the Rules of Evidence does not necessarily signify that the exception to the hearsay rule would not have been judicially recognized under pre-existing case law, and the principle statement relied on would likely have been admitted under the "excited utterance" exception. The opinion on direct appeal supports the contention that the evidentiary ruling could be sustained under pre-existing law. *Emery*, 186 F.3d at 926.

Advancing particular arguments on appeal is always a matter of selectivity, and I would not be prepared to fault appellate counsel even if the Court of Appeals in this case might conceivably agree with movant on the substantive question. Under these circumstances I may not even issue a certificate of appealability on this point. The ex post facto argument is ruled against petitioner.

## II.

■ Next I will take somewhat out of turn what may be referred to as the "Coy problem", because I have filed new material (the bulk of the Ronald Coy grand jury testimony) which sheds new light on the fatal events. Movant contends, from an affidavit he has obtained from Coy, that Coy's testimony would have been both im-

portant and exculpatory, and that it was either nondisclosed by the Government or known to but unused by his counsel. Thus, he claims there was either a *Brady* violation or an ineffective assistance issue of major significance.

Trial counsel have stated, by affidavit, that Coy's counsel told them he would assert the Fifth Amendment privilege if called, and thus any favorable aspects of his story were not available at the trial. Movant argues, however, that the grand jury testimony in May of 1997 waived Coy's privilege against self-incrimination, if he had sought to assert it long afterward, at trial. Movant further relies on Coy's current uncounselled statement that he is willing to testify. In the alternative movant says the grand jury testimony would have been admissible as the testimony of an unavailable witness. I shall assume there was no waiver, in light of the trial testimony intimately connecting Coy with the killing of Ms. Elkins, whereas when the grand jury heard him he seems not to have been seriously suspected of such a grave crime. On advice of counsel I would expect assertion of the privilege against self-incrimination. I shall further assume, however, that either party could have used the grand jury testimony now filed in this case.[5]

As to the *Brady* claim, the Government asserts the testimony was made available to defense counsel. Doc. 13, page 39. Movant does not dispute this, but denies he was aware of the contents of the transcript. For present purposes, therefore, I shall assume we have an ineffective assistance of counsel issue, pure and simple.[6]

My evaluation is the same as that of Coy's counsel. Although portions of the testimony might have been helpful to the defense, if believed, taken as a whole the grand jury testimony makes Emery the central figure in the murder plot and does not preclude him from having the central role in the killing itself. Without citation of all damaging material I refer to pages 40–42, 46, 48, 55–57 and 67.[7] Coy's failure to acknowledge his role to the extent the testimony of others implicates him converts the grand jury testimony into a "can

5. The question of admissibility of the grand jury testimony could have some complexity, although I will accept Emery's presently unchallenged contention that his counsel could have used favorable parts of the testimony before the grand jury. See, however, *United States v. Salerno*, 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). If the grand jury testimony was favorable to Emery I believe counsel should have offered it, and I am not now prepared to speculate that it would have been rejected by me. I do suppose, however, that Emery's counsel could not offer favorable testimony as credible and then object to unfavorable testimony as so unreliable that it could not be presented to the jury. Even without defendant's reliance on grand jury testimony, there is case law allowing the Government to use such testimony when a witness is unavailable. See, e.g., *United States v. Earles,* 113 F.3d 796 (8th Cir.1997). As in *Earles,* the admission of all rather than selected portions of the grand jury testimony would increase the likelihood that the jury

could ascertain the truth about Emery's conduct. 113 F.3d at 801. See also *United States v. Papajohn,* 212 F.3d 1112, 1119–20 (8th Cir.2000).

6. The true factual situation is somewhat elusive, because the affidavits of defense counsel and their investigator do not specifically acknowledge they reviewed the grand jury transcript pre-trial, and seem rather to have relied on what they were told by Coy's counsel. Arguably that would suffice, although the significance of the Coy testimony probably means that there was a duty to carefully study the grand jury testimony. Whether we have a *Brady* question or an effective assistance question, however, the analysis is probably the same.

7. The intriguing new evidence that Emery told Coy that Tug and Miller "run away from the job" (Tr. 57) seems to distinctly support Tug's trial testimony but is not totally clear. Tr. 81.

of worms" for either side. I cannot fault the prosecution for abandoning Coy as a witness (either live or through his grand jury testimony) but I also cannot find fault with a defense decision to avoid use of Coy. Coy serves most clearly to nail down Emery's guilt, unless one indulges in the fallacy rejected on appeal, that the Government was required to prove beyond a reasonable doubt that it was Emery who struck the fatal blow. Taking the Coy grand jury evidence into account the evidence is overwhelming that the Elkins murder was movant's responsibility from start to finish.

On this record one cannot find ineffective assistance of trial counsel in failing to use Coy, and one cannot find likely prejudice to Emery from the failure to offer in evidence the grand jury testimony.

### III.

■ Turning to what I believe is the final issue of substance, was there ineffective assistance of counsel in declining to file a motion for new trial after being alerted to the story that Tug was remorseful for implicating Emery in order to protect himself? The facts are set forth in the written statements of Sidney Griffin (Exhs. 34 and 35 in the attachment to my memorandum of March 19, 2003) and in affidavits of defense counsel and investigator Thompson, also attached to that memorandum.

I agree with the Government that the wording of the Griffin statements is suspect, suggesting Emery's authorship and leading. For present purposes, however, the doubt will be resolved in favor of movant, absent a hearing to examine what Griffin would say under oath when subject to cross-examination. Also giving the movant the benefit of the doubt, I accept Thompson's affidavit that he learned from Griffin in December, 1998, well after trial, that Tug had acknowledged to Griffin some months before trial, that "he went down the stairs and finished her off by hitting her over the head with a pipe wrench". This may not coincide with the recollection of former counsel Jacqueline Cook, now a Missouri Circuit Judge, as it is not in her affidavit. It was the exact role Tug testified that Emery admitted to him.

■ I agree with defense counsel's view that a motion for new trial, based on newly discovered evidence, would have been rejected by me under these circumstances.[8] The jury was instructed, in an instruction approved by the Circuit on appeal, that the exact role of Emery need not be proven. Even if Tug was more culpable in a moral sense, as the most active murderer, and deserved more than the 22 year sentence he ultimately received, this would not relieve Emery from legal responsibility or a life sentence, as the person with the principal motive, the planner and recruiter, and an active participant in the killing. The

---

**8.** Recantations of testimony are viewed with suspicion. *United States v. Papajohn, supra,* 212 F.3d at 1117. Similar suspicion attaches to post-trial stories emanating from friendly inmates. Planted stories flourish like weeds in a prison sitting. Absent a hearing, however, I am not prepared to rule that a jury would probably reject Tug's revised testimony consistent with the supposed conversation with Griffin (assuming that could be obtained) or would reject Tug's repeated testimony after impeachment by Griffin. I simply conclude

that a change in the evidence on retrial would not "probably produce an acquittal", as required. Ibid. at 1118. Defense counsel's similar view, based in part on the way the case was submitted by me, was not ineffective assistance of counsel. Further, the Government reminds me that Tug's "confession" to Griffin is cumulative with his statements made to James Witt, already in evidence. Doc. 27, pages 4–5. See Trial Transcript pages 770–1, 795.

books are full of murder prosecutions of persons who do not pull the trigger. To repeat, the Coy grand jury testimony reaffirms my view that justice was done in this case, and that there is no defect in the proceedings that would fairly authorize relief.

The motion to vacate the judgment is therefore DENIED.