Death Opinion
















IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






No. AP-76,140






RAYMOND DELEON MARTINEZ, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 387158 IN THE 184TH DISTRICT COURT

HARRIS COUNTY






 Holcomb, J., delivered the opinion of the Court, in which Keller, P.J.,
and Price, Womack, Johnson, Keasler, Hervey, and Cochran, JJ.,
joined. Meyers, J., dissented.



 Appellant was convicted of capital murder in October 1989 for an offense committed
in July 1983. (1) Tex. Penal Code Ann. §19.03(a)(2). Pursuant to the jury's answers to the
statutory punishment issues, the trial court sentenced appellant to death. Art. 37.071 §2(e). (2) 
This conviction and sentence were affirmed on direct appeal. Martinez v. State, 867 S.W.2d
30 (Tex. Crim. App. 1993). In September 2007, this Court granted habeas corpus relief, set
aside appellant's death sentence, and remanded the case to the trial court for a new
punishment hearing. Ex parte Martinez, 233 S.W.3d 319 (Tex. Crim. App. 2007) (granting
a new punishment hearing because the jury did not have a vehicle through which to give
meaningful consideration to appellant's constitutionally relevant mitigating evidence).

 In 2009, the trial court held a new punishment hearing before a new jury. Based on
the jury's answers to the special issues set forth in Article 37.0711, sections 3(b) and 3(e),
the trial court sentenced appellant to death. Art. 37.0711 §3(g). Direct appeal to this Court
is automatic. Art. 37.0711 §3(j). After reviewing appellant's seven points of error, we find
them to be without merit. Consequently, we affirm the trial court's sentence of death.

STATEMENT OF FACTS

 On July 11, 1983, appellant and Antonio Riojas entered the Long Branch Saloon in
Houston to "case" the establishment. The men each ordered a beer, sat at one end of the
horseshoe bar, and then took a drink while looking around. They then left without finishing
their beers. The next evening, the men returned to the Long Branch Saloon, ordered beers,
and took a drink. They asked the bartender, Rose Hardman, (3) to point out the manager. When
Hardman pointed to Herman Chavis, the men left.

 On July 13, the men were joined by Jackie Kirtley and once again went to the Long
Branch Saloon. They ordered beer and took a drink. This time, however, they did not leave. 
Riojas "backed up to the [front] door" and locked it. He then drew a gun and pointed it at
some patrons. Kirtley went to the "back" of the saloon, near the pool tables, and fumbled
with a storage-room door. Appellant went behind the bar and told Hardman to give him the
money from the register. Appellant told her that he wasn't "playing" and pushed her toward
the register while pressing a gun to her ribs.

 Meanwhile, Kirtley ordered a patron to "get on the floor." When the patron didn't
respond immediately, Kirtley picked up a pool cue and swung it at the patron. Chavis, who
was nearby, intervened and grabbed Kirtley in a bear hug to prevent him from hitting the
patron with the pool cue. The scuffle caught appellant's attention. He pushed Hardman to
the floor, stepped up onto an ice chest cooler, took aim, and shot Chavis multiple times, at
the same time injuring Kirtley in the chest and shoulder. Chavis died from the gunshot
wounds.

 Appellant, Riojas, and Kirtley fled the saloon without obtaining any cash from the
register. Appellant told Mary Lou Garcia Salazar, who was waiting in the getaway car, that
he "had to unload his whole - the whole - his whole gun" when he shot Chavis. Appellant
gave Kirtley $40 and dropped him off at a friend's house with the understanding that Kirtley
would tell anyone who asked that he had been walking down the street and had been shot by
"some guy." According to Salazar, appellant displayed no remorse. FUTURE DANGEROUSNESS

 In his first and second points of error, appellant challenges the legal and factual
sufficiency of the evidence supporting the jury's future dangerousness determination. Art.
37.0711 §3(b)(2). This Court has consistently declined to conduct a factual-sufficiency
review in this context, and appellant's arguments do not persuade us to retreat from these
holdings. Renteria v. State, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006); Russeau v. State,
171 S.W.3d 871, 878 n.1 (Tex. Crim. App. 2005). More importantly, appellant's factual-sufficiency point of error is ultimately premised on our decision in Clewis v. State, 922
S.W.2d 126, 129 (Tex. Crim. App. 1996), in which we established "the proper standard of
review for factual sufficiency of the elements of the offense," and we overruled Clewis in
Brooks v. State, No. PD-0210-09, ___S.W.3d___ (Tex. Crim. App.-Oct. 6, 2010). We
therefore overrule point of error two.

 Appellant challenges the legal sufficiency of the evidence supporting the jury's
determination regarding the future dangerousness issue, particularly in light of his advanced
age and his twenty-nine years of "unremarkable time in prison" society during which he
exhibited only "relatively minor bad behavior." 

 A jury may consider a variety of factors when determining whether a defendant will
pose a continuing threat to society. Wardrip v. State, 56 S.W.3d 588, 594 & n.7 (Tex. Crim.
App. 2001); Keeton v. State, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). Contrary to
appellant's argument that this Court must "look for all the Keeton factors," (4) this Court has
previously held that the facts of the offense alone may be sufficient to sustain the jury's
finding of future dangerousness. Fuller v. State, 253 S.W.3d 220, 231-32 (Tex. Crim. App.
2008); Sonnier v. State, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995); Kunkle v. State, 771
S.W.2d 435, 449 (Tex. Crim. App. 1986). We must view all of the evidence in the light most
favorable to the jury's finding and determine whether, based on that evidence and reasonable
inferences therefrom, a rational jury could have found beyond a reasonable doubt that the
answer to the future dangerousness issue was "yes." Ladd v. State, 3 S.W.3d 547, 557-58
(Tex. Crim. App. 1999).

 In addition to the facts of this offense, the sentencing jury heard testimony regarding
appellant's criminal history, gang affiliation, and behavior in prison. The jury heard that
appellant was difficult to control as a child, and he was not interested in working with his
family. As his father described, when the family would pick cotton in the fields, appellant
would go fishing rather than help.

 Appellant's lengthy history with the criminal justice system began at the age of fifteen
when he was adjudicated delinquent and committed to one and one-half years detention in
Gatesville State School for Boys ("Gatesville") for statutory rape. Within just a few months
of his release, appellant was adjudicated delinquent for theft and returned to Gatesville to
serve seven months more. While in Gatesville, appellant tried to enlist his brother's help to
escape and did attempt to escape. Within a month of his release from the juvenile system at
the age of eighteen, appellant committed burglary. He was sentenced to two years of
imprisonment in the Texas Department of Corrections ("TDC"). (5)

 In 1965, appellant attempted to escape from the Brown County jail while awaiting
transfer to TDC. Following his release, he committed burglary and was found not guilty by
reason of insanity. He was committed to Rusk State Hospital in May 1967. His sanity was
deemed restored and he was released on June 30, 1969. Appellant went on to commit four
robberies, two of which were armed, and theft of an automobile. He also escaped from jail. 
Upon his conviction for these offenses in August and September 1969, he was sentenced to
twenty years of imprisonment for each of the robberies, five years for escape, and two years
for theft.

 The jury learned that, during this period of incarceration, appellant became an
organizer and leader of the Texas Syndicate prison gang. The jury learned from a forensic
neuropsychiatric evaluation, Defense Exhibit number 33, that appellant "killed those who
opposed the formation of the [prison gang]." He was "chronically violent, physically and
verbally, and would attack others with little provocation." Appellant stabbed an inmate in
April 1975, and two others in September 1976. In April 1978, he created a weapon
constructed of a "7-inch steel rod sharpened to a point" and stabbed another inmate. 
"Intoxicating inhalants" were discovered in his cell, and guards found him "huffing." 
Marijuana was found concealed under the mattress in appellant's cell in October 1981. 
Appellant was paroled in December 1982.

 After his release to parole, appellant lived primarily in Fort Worth with his sister Julia
Martinez Gonzales and her daughter, Laura Escoto. He warned his niece that she should be
afraid of him, and he gave her and his nephew loaded guns to play with on at least one
occasion. When admonished for this by Gonzales, appellant was unconcerned and laughed. 
He occasionally stayed with his sister Raquel DeLaCruz and her husband. Appellant bragged
to DeLaCruz and his brother Johnny DeAnda (6) that he had stabbed an inmate in prison and
had committed more than seventeen robberies in the Fort Worth area. He explained to
DeAnda that he would lure a club-goer outside with him and then knock out and rob the
person. Appellant told DeLaCruz that he was a leader in the Texas Syndicate. He also stole
her car and held a gun to her head on separate occasions.

 Appellant's father attempted to help him find a job, but appellant was not interested
in work. Instead, he wanted to establish a methamphetamine lab or grow marijuana to
generate funds for the Texas Syndicate. To begin this project, appellant obtained between
ten and fifteen thousand dollars and went to California to purchase the chemicals necessary
to "cook" methamphetamine. Once he obtained the chemicals, appellant shot the man who
delivered them. He disposed of the man's body, kept the money, and returned to Texas.

 In early 1983, appellant checked himself into a mental hospital after he was no longer
welcome in his family members' homes. He intended to "stall for time" and to wait for
Kirtley to be released from prison. However, he was discharged from the hospital just a few
months later when he assaulted someone. He then joined up with Riojas. In May 1983,
appellant met Salazar, who was a teenage runaway. Salazar learned that appellant and Riojas
were members of the Texas Syndicate. Appellant attempted to recruit Salazar to join the
gang. He controlled where she could go and what she could do, to the point of forcing her
to prostitute herself on at least two occasions.

 On July 11, 1983, appellant began a crime spree that resulted in the deaths of five
people, including the victim in this case. That day, Riojas "cased" the Don Ramon Lounge,
and both appellant and Riojas "cased" the Long Branch Saloon. That night, the two men,
accompanied by Mary Guerra, returned to the Don Ramon Lounge, where they ordered beer
and sat in a booth. They then pulled out their guns and ordered everyone to the floor. Guerra
stood watch by the front door while appellant took money from the cash register. Appellant
then ordered many of the customers into the restroom. At some point, he began shooting. 
Moses Mendez was shot and killed. (7) Appellant, Riojas, and Guerra fled to a waiting car.

 Early in the evening on July 12, 1983, appellant and Riojas again "cased" the Long
Branch Saloon. Around 9:00 p.m. that night, they entered Elaine's Lounge. Appellant
vaulted over the bar, pointed his gun at the bartender, and demanded that she open the cash
register. During the robbery at Elaine's Lounge, witnesses recognized that appellant was
"definitely in charge." Appellant terrorized patrons, pistol-whipping one and threatening
another that he would "blow [his] fucking brains out." He took money and jewelry from the
patrons and then ordered them into the men's restroom. Appellant warned them before
leaving that "if any one of you sticks your head out this door in the next five minutes, you
will be blown to hell."

 The following night, appellant and Riojas were joined by Kirtley and executed their
plan to rob the Long Branch Saloon as described in the statement of facts. After the murder
at the Long Branch Saloon, appellant, Riojas, and Salazar left Houston. They drove to Fort
Worth where they stayed with appellant's sister, Gonzales, and her daughter, Escoto. 
Gonzales introduced appellant to her boyfriend Guillermo "Willie" Chavez.

 On July 15, 1983, after dropping Escoto off at a skating rink, appellant, Gonzales,
Riojas, and Salazar met Chavez at a night club where appellant and Chavez had a
disagreement. Later, while driving to another night club in the Fort Worth area, appellant
argued with Gonzales about his dislike of her boyfriend. Appellant told Gonzales that he had
decided that he was going to kill Chavez. Gonzales told appellant, "[I]f you're going to kill
him, you have to kill me first." Appellant pulled the car onto a darkened street. He and
Gonzales got out of the car and continued to argue while Riojas physically restrained Chavez
in the car. The argument ended with appellant shooting Gonzales and leaving her to die on
the side of the street. Appellant returned to the car where he shot Chavez seven times. 
Chavez's body fell out of the passenger side of the car. Appellant directed Salazar to take
Chavez's wallet, but she refused. Appellant, Riojas, and Salazar returned to Gonzales' home,
where appellant went through her things and ransacked the apartment. Escoto, who had
received a ride home from a friend, saw her uncle climbing out of the apartment window. 
Appellant, Riojas, and Salazar drove south to Waco, where they split up.

 Several days later, the group reunited at the Big State Motel in Houston where
appellant was introduced to Traci Pelkey. Appellant announced to the others that Pelkey was
"his girl." On July 21, 1983, the group decided to leave the motel, but Pelkey wished to stay
behind. As the group began to drive away, appellant got out of the truck and went back
around the corner of the motel to where Pelkey had remained. Appellant and Pelkey argued
as they "came back around" to the truck. Appellant hit Pelkey over the head with his gun and
shot her three times in the chest. 

 Appellant drove away with Riojas and Salazar, leaving Pelkey to die on the side of
the road. When Riojas asked him, "Why the hell did you do that for?" appellant responded,
"This chick was trying to get slick with me. So I killed her." The group hid out at Riojas'
home where they were discovered and arrested on July 23, 1983.

 Appellant has been in custody since his 1983 arrest. According to Texas Department
of Criminal Justice ("TDCJ") records, appellant accumulated 34 documented disciplinary
incidents between 1986 and 2005. (8) Four of the incidents were classified as minor, and thirty
were classified as major. Sixteen of the major incidents were assaults on correctional
officers, many for spitting or chunking. (9) Two others were assaults on inmates. Cay Cannon,
a member of the TDCJ State Classification Committee, related that appellant is a confirmed
gang member.

 Despite appellant's assertion that he has exhibited only "relatively minor bad
behavior," the descriptions of a sampling of his disciplinary infractions, which occurred
while appellant was in a single cell apart from the general population, are not minor. In
February 2002, during a hostage situation in which a female guard was held by armed
inmates, appellant had a full view of the situation from his cell. He encouraged the other
inmates to kill the guard by shouting, "Kill that bitch! Kill that bitch!" He also interfered
with the ability of other guards to ensure the hostage's safe release.

 In June 2002, appellant made a homemade spear and threw it at another inmate,
narrowly missing a correctional officer. In September of the same year, appellant was caught
masturbating in a public area and refused to stop when ordered to do so by a correctional
officer. In August 2004, a correctional officer discovered contraband in appellant's cell
during a standard search. The contraband was minor, but appellant's reaction was not. 
Appellant spat into the face and mouth of the officer and then cursed and threatened the
officer with physical violence. Appellant's reaction was "total rage and aggression."

 In April 2005, appellant wanted punch rather than tea with his meal. He got "mad
about it . . . started screaming" and spat in a correctional officer's face. That same month,
appellant spat in the face of another correctional officer while being escorted back to his cell
from the infirmary after being told that he could not see a doctor immediately.

 In January 2008, while housed in the "most secure" pod of the Harris County Jail,
appellant managed to unlock his cell door and attack another inmate who had previously
thrown feces into appellant's cell. Appellant "won" the fight against the other inmate, who
was described as strong and "well-built" and was 40 years younger than appellant. 
Correctional officers with many years of experience described appellant as significantly more
dangerous than other inmates.

 Appellant's poor behavior was not reserved for correctional officers and other
inmates. In the spring of 2004, Laura Escoto visited appellant in prison to gain closure
regarding her mother's murder. Appellant told Escoto that "he was sorry that he killed [her]
mom, but she got in the way." Escoto related that appellant seemed neither sincere nor
remorseful. Escoto believed that appellant wanted to continue a relationship with her so that
she would buy him things and help him publish a book about his life.

 Appellant bragged to Escoto that he had committed 20 assaults against guards and had
raped other inmates at knife point. He told her that he wanted to kill more people. When
appellant was upset with his sister, DeLaCruz, he told Escoto that he "had killed the wrong
sister." Appellant also bragged about his health and physical condition, telling Escoto that
even though he was in his sixties, he still did two hundred situps and pushups each day. 
According to Escoto, appellant was never remorseful for things he had done and referred to
himself as a "psychopath."

 When Escoto decided that she was not interested in corresponding with or visiting
appellant any longer, appellant began threatening her. Appellant reminded Escoto that prior
to his incarceration, he had found a previous boyfriend of her mother's and "beat the shit out
of him" because he believed the boyfriend had treated Escoto badly. Appellant claimed that
if he had been armed when he found the man, he would have killed him. Appellant also told
Escoto that she didn't know who he was or what he belonged to. He reminded her that he
was a part of the Texas Syndicate and threatened that he had "people on the outside" who
would "take care" of her and her family if he wanted.

 In 2008, while appellant was in the Harris County Jail awaiting his new punishment
hearing, he wrote several letters to members of his family. In one, he wrote that he had killed
his sister when "she grabbed [his] arm to stop" him from killing Chavez. He closed the letter
by writing that he "shot [Chavez] twice in the head. Guess that will be all." In others, he
bragged about the fight he had in the Harris County Jail with a "big black young dude." He
related that he was able to "jam [his] door" and open it. He wrote that he beat the other
inmate because the other inmate "had been disrespecting" him. Appellant was proud that he
was able to physically defeat someone much younger than himself.

 Appellant celebrated his sixty-fourth birthday in July 2010. He presented the jury with
information about "aging out," a term that describes the general inverse relationship of
criminality and violence to age, and now argues that his incidents of criminality have
decreased as he has aged, and that if given a life sentence, that he will never be paroled and
will die in prison. Appellant's own disciplinary history belies his argument that he has "aged
out." Moreover, appellant's age was only one of the many factors jurors were allowed to
consider in determining whether he would be a continuing threat to society. Keeton, 724
S.W.2d at 61.

 Appellant also relies on this Court's decision in Berry v. State, 233 S.W.3d 847 (Tex.
Crim. App. 2007), to support his argument that he would not pose a continuing threat to
society within prison. We understand appellant to argue that Berry should be read to require
the jury to consider, within its future dangerousness determination, whether a capital
defendant sentenced to life imprisonment would be a continuing threat to prison society. 
This Court has previously interpreted the future dangerousness special issue to ask whether
a defendant would be a continuing threat "whether in or out of prison" without regard to how
long the defendant would actually spend in prison if sentenced to life. Estrada v. State, 313
S.W.3d 274, 281 (Tex. Crim. App. 2010) (quoting Druery v. State, 225 S.W.3d 491, 507
(Tex. Crim. App. 2007)); see also Braxton v. State, 909 S.W.2d 912, 919 (Tex. Crim. App.
1995) (adopting the reasoning of the plurality opinion in Smith v. State, 898 S.W.2d 838, 846
(Tex. Crim. App. 1995) (plurality op.), which stated that the term "society" includes both the
prison and non-prison populations). Appellant's reasoning does not persuade us that our
interpretation of "society" is in error.

 Further, Berry is distinguishable from this case. In Berry, this Court decided that the
evidence was legally insufficient to support an affirmative answer to the future
dangerousness special issue because the evidence showed that the defendant was dangerous
to only some, but not all, of her own newborn children, which she would not likely have
during her child-bearing years in prison. Berry, 233 S.W.3d at 863-64. Therefore, a jury
could not rationally find that the defendant was a future danger. Id. The evidence in this
case, however, supports a finding that appellant is dangerous to a broad range of potential
victims both inside and outside of prison.

 The jury had before it evidence of appellant's extensive criminal history as well as
evidence of his continued disciplinary problems during his incarceration. The jury further
heard testimony about appellant's continued lack of remorse as well as his violence and
threats against his own family. Having viewed all of the evidence in the light most favorable
to the jury's finding, we determine, based on that evidence and reasonable inferences
therefrom, that a rational jury could have found beyond a reasonable doubt a probability that
appellant would pose a continuing threat to society. Point of error one is overruled.

DELIBERATENESS

 In point of error three, appellant claims the evidence is factually insufficient to support
the jury's affirmative answer to the deliberateness special issue, "whether the conduct of the
defendant that caused the death of the deceased was committed deliberately and with the
reasonable expectation that the death of the deceased or another would result." Art. 37.0711
§3(b)(1). Appellant's point of error is premised on our decisions in Clewis v. State, 922
S.W.2d 126 (Tex. Crim. App. 1996), and Wardrip v. State, 56 S.W.3d 588 (Tex. Crim. App.
2001). In Clewis, we established "the proper standard of review for factual sufficiency of
the elements of the offense." Clewis v. State, 922 S.W.2d at 129. In Wardrip, we held that
"the deliberateness special issue may be reviewed for factual sufficiency using the Clewis
standard." Wardrip v. State, 56 S.W.3d at 591. However, in Brooks v. State, No. PD-0210-09, ___S.W.3d___ (Tex. Crim. App.-Oct. 6, 2010), we overruled Clewis and, in effect,
overruled the Wardrip factual-sufficiency holding as well. We therefore overrule point of
error three. 

EXTRANEOUS OFFENSE

 In point of error four, appellant complains that the trial court committed reversible
error by admitting testimony regarding an unadjudicated extraneous offense, an "alleged
threat against the unborn child of a witness," over objection.

 Linda Burch testified in the 2009 punishment hearing that she was "obviously
pregnant" when she testified against appellant during his 1984 trial. Over appellant's
objections of relevancy and prejudice, Burch testified that when she finished giving her 1984
testimony and was walking away from the witness stand, she passed by appellant who looked
at her and asked, "Do you ever think you're going to have that one alive?" Burch interpreted
this statement as a threat against the life of her unborn child. She testified that she left the
courtroom crying but did not tell anyone other than her husband about appellant's remark
until speaking with the prosecutor prior to the 2009 punishment hearing. The prosecutor
immediately notified the defense of its intent to offer the evidence. (10)

 We review the trial court's decision to admit or exclude evidence, as well as its
decision as to whether the probative value of evidence was substantially outweighed by the
danger of unfair prejudice, under an abuse of discretion standard. Green v. State, 934
S.W.2d 92, 104 (Tex. Crim. App. 1996). The trial court does not abuse its discretion unless
its determination lies outside the zone of reasonable disagreement. Id. 

 Article 37.0711, section 3(a), permits a trial court during the punishment stage of a
capital murder trial to admit evidence "as to any matter that the court deems relevant to
sentence." Generally, evidence of extraneous bad acts committed by the defendant is
relevant and admissible at the punishment stage of a capital murder trial, so long as the State
"clearly proves" that the misconduct occurred and that the defendant was the perpetrator. 
Young v. State, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009). Burch's testimony under oath
that appellant made the statement to her was sufficient to "clearly prove" that the misconduct
occurred and that appellant was the perpetrator.

 Relevant evidence is that which has any tendency to make the existence of any fact
of consequence more or less probable than it would be without the evidence. Tex. R. Evid.
401. We have held that future dangerousness is an issue relevant to the punishment phase
of a capital murder trial. Mason v. State, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995). 
Burch's testimony was relevant to the jury's determination of appellant's future
dangerousness under Rule 401 because it had a tendency to make the existence of appellant's
future dangerousness more probable than it would be without the evidence. See Garcia v.
State, 887 S.W.2d 862, 879 n.19 (Tex. Crim. App. 1994) (noting that the defendant's threat
to kill a witness was "admissible at punishment as substantive evidence of future
dangerousness"). 

 Appellant further contends that, even if relevant, the probative value of this evidence
was substantially outweighed by the danger of unfair prejudice. Appellant characterizes the
evidence as having "relatively low probative value and . . . extremely high prejudicial effect." 
He goes on to state that the "permissible probative value of the [statement] was virtually, if
not entirely[,] absent." (Emphasis in original).

 Texas Rule of Evidence 403 provides:

 Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay, or needless
presentation of cumulative evidence.


"Rule 403 favors the admission of relevant evidence, and carries a presumption that relevant
evidence will be more probative than prejudicial." Young, 283 S.W.3d at 876.

 We disagree with appellant that his statement to Burch had no probative value. That
appellant would make such a statement to an obviously pregnant woman regarding an unborn
child is some evidence of his character. Appellant asserts that, because the statement is
evidence of his character, it should have been excluded. Evidence of a defendant's character,
however, is one of the factors that a jury may consider in its future dangerousness
determination. Keeton, 724 S.W.2d at 61. 

 Furthermore, Rule 403 does not require exclusion of evidence simply because it
creates prejudice; the prejudice must be "unfair." State v. Mechler, 153 S.W.3d 435, 440
(Tex. Crim. App. 2005). The danger of unfair prejudice exists only when the evidence has
the "potential to impress the jury in an irrational way." Id. at 440-41. That was not the case
here. Although the State elicited the information from Burch, it was never mentioned again
and was not relied upon by the State during its closing argument. The trial court did not
abuse its discretion in admitting the evidence regarding appellant's statement to Burch. Point
of error four is overruled.

RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES

 In point of error five, appellant alleges that the trial court violated his Sixth
Amendment right to confront and cross-examine a witness by allowing Johnny DeAnda's
1989 testimony to be read into evidence.

 Prior to the presentation of evidence, the State made the trial court aware that it
intended to present the testimony of former witness DeAnda by reading it into the record
because DeAnda had passed away. At that time, appellant indicated agreement with the use
of the transcript. Later, however, appellant filed a motion objecting to the use of the
transcript. Appellant argued that he was limited in his cross-examination because during the
previous trial, appellant's former attorney had "fail[ed] to thoroughly and fully go into
mitigating evidence and facts and circumstances regarding [appellant]." We interpret this
language to mean appellant objected that his prior counsel did not have a similar motive for
cross-examining DeAnda at the previous trial. See Tex. R. Evid. 804(b)(1). (11) The trial court
overruled appellant's objection, and on the day before closing arguments, appellant filed a
second motion objecting to the use of the testimony pursuant "to the [United States]
Constitution 6, 8, 14th, and 16th Amendments to the [C]onstitution and pursuant to U.S. v.
Crawford and its progeny." (12)

 The Confrontation Clause of the Sixth Amendment to the United States Constitution
provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be
confronted with the witnesses against him." The Confrontation Clause bars out-of-court
testimonial statements by a witness unless the witness is unavailable to testify and the
defendant had a prior opportunity to cross-examine the witness. Crawford v. Washington,
541 U.S. 36, 68 (2004). The United States Supreme Court has not provided a comprehensive
definition of testimonial statements, but it has stated that the term applies "at a minimum to
prior testimony at a preliminary hearing, before a grand jury, or at a former trial." Id.

 The record shows that DeAnda was "unavailable" as a witness because he died after
testifying in 1989. DeAnda's testimony during appellant's 1989 trial constituted "testimony
given as a witness at another hearing." Finally, the record shows that appellant's attorneys
did cross-examine DeAnda during the 1989 trial. Therefore, under the plain language of
Crawford, DeAnda's former testimony was constitutionally admissible during appellant's
2009 punishment hearing.

 Appellant, however, appears to additionally argue that the "similar motive"
requirement in Texas Rule of Evidence 804(b)(1) is coextensive with the requirements of the
Confrontation Clause and should have prevented the admission of DeAnda's testimony in
this case. Specifically, he argues that because the punishment charge to the jury in 1989 did
not contain a separate mitigation instruction, appellant did not have the same motivation to
cross-examine DeAnda regarding mitigation as he did in 2009, when the jury charge
contained a separate mitigation instruction. Appellant asserts that he did not have the same
focus in 1989 and, therefore, did not subject DeAnda to the same depth and breadth of cross-examination regarding mitigation as he would have in the 2009 hearing. Assuming, as we
did in a prior unpublished opinion, that the "similar motive" requirement found in the rules
of evidence is also required by the Confrontation Clause, we address appellant's claim. See
Broxton v. State, No. AP-71,488 (Tex. Crim. App. June 29, 2005) (not designated for
publication), 2005 Tex. Crim. App. Unpub. LEXIS 393, at *20.

 As a general rule, when the parties, the charge, and the issues to be litigated are the
same in the first and second trials, the two proceedings are necessarily the same and former
testimony is admissible. Bryan v. State, 837 S.W.2d 637, 644 (Tex. Crim. App. 1992). 
However, as appellant points out, the language of the jury charge in the 2009 punishment
hearing is different from the language of the jury charge at punishment in the 1989 trial. The
trial court's punishment charge at the 1989 trial contained the three special issues required
by Texas law at the time: the deliberateness, future dangerousness, and provocation special
issues. In response to the United States Supreme Court's decision in Penry v. Lynaugh, (13)
which had been decided approximately four months before appellant's 1989 trial, the trial
court also submitted a supplemental jury instruction, which instructed the jury to negatively
answer any one of the three special issues if it found sufficient mitigating circumstances to
warrant a sentence less than death when deliberating "on the questions posed in the special
issues." (14)

 The jury charge at the 2009 punishment hearing included both the deliberateness and
future dangerousness special issues. It did not include the provocation special issue. Also,
rather than a supplemental instruction, the jury charge contained a third special issue, the
mitigation special issue, that asked:

 Do you find from the evidence, taking into consideration all of the evidence,
including the circumstances of the offense, the defendant's character and
background, and the personal moral culpability of the defendant, that there is
a sufficient mitigating circumstance or circumstances to warrant that a
sentence of life imprisonment rather than a death sentence be imposed?


 While the language of the 1989 supplemental instruction is undeniably different from
the language of the 2009 mitigation special issue, the purpose of each instruction was the
same: to instruct the jury to consider mitigating evidence that might cause the jury to
determine that a life sentence would be a more appropriate sentence than death. The parties,
issues, and underlying purpose of the jury charge were the same in both 1989 and 2009. 
Further, defense counsel in 1989 and 2009 had the similar motive of presenting mitigating
evidence to the jury. That appellant is now dissatisfied with the depth of prior counsel's
cross-examination of DeAnda does not affect that motive. See Coffin v. State, 885 S.W.2d
140, 149 (Tex. Crim. App. 1994) (citing United States v. Salerno, 505 U.S. 317, 329 (1992)
(Stevens, J., dissenting) (noting that having a similar motive and opportunity but not actually
acting on it does not render former testimony inadmissible)); see also United States v.
Salerno, 505 U.S. at 326 (Blackmun, J., concurring) (pointing out that "similar motive" does
not mean "identical motive"). Therefore, the trial court did not violate appellant's Sixth
Amendment right to confront and cross-examine a witness by admitting DeAnda's former
testimony. Point of error five is overruled.

"10/12 RULE"

 In point of error six, appellant alleges that the "10/12 rule" violates the Eighth
Amendment of the United States Constitution. He argues that the trial court failed to instruct
jurors that a vote by one of them would result in a life sentence despite the statutory
requirements of ten votes for a "no" response to the question of future dangerousness, or for
a "yes" response to a finding of a mitigating circumstance. Appellant asserts that the "10/12
rule" unduly pressures jurors to change their votes to reach a result. This Court has
consistently upheld the "10/12 rule" as constitutional. Prystash v. State, 3 S.W.3d 522, 536
(Tex. Crim. App. 1999); McFarland v. State, 928 S.W.2d 482, 519 (Tex. Crim. App. 1996);
Lawton v. State, 913 S.W.2d 542, 558-59 (Tex. Crim. App. 1995). Appellant has given us
no reason to revisit this issue. Point of error six is overruled.

CONSTITUTIONALITY OF ARTICLE 37.0711 (15)

 In his seventh point of error, appellant complains that the capital murder sentencing
statute is unconstitutional because it allows the jury to determine future dangerousness based
solely on the facts of the case. This Court has consistently held that the jury may consider
a variety of factors when determining whether a defendant will pose a continuing threat to
society. Fuller v. State, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); Sonnier v. State,
913 S.W.2d 511, 517 (Tex. Crim. App. 1995); Kunkle v. State, 771 S.W.2d 435, 449 (Tex.
Crim. App. 1986). This Court has also consistently held that the circumstances of the offense
itself, if severe enough, may be sufficient to support an affirmative finding to the future
dangerousness special issue. Hunter v. State, 243 S.W.3d 664, 672-73 (Tex. Crim. App.
2007); Barley v. State, 906 S.W.2d 27, 30 (Tex. Crim. App. 1995); Barnes v. State, 876
S.W.2d 316, 322 (Tex. Crim. App. 1994); Keeton, 724 S.W.2d at 61. Appellant's arguments
do not persuade us to reconsider our prior decisions upholding the constitutionality of the
Texas death penalty scheme. Point of error seven is overruled.

 We affirm the judgment of the trial court. 


DELIVERED DECEMBER 15, 2010


PUBLISH

1. Appellant had previously been convicted of this offense and sentenced to death in 1984,
but that conviction and sentence were overturned on direct appeal based on jury-selection error. 
Martinez v. State, 763 S.W.2d 413 (Tex. Crim. App. 1988).
2. Unless otherwise indicated all future references to Articles refer to Code of Criminal
Procedure.
3. The bartender's proper name, as indicated in the record, is Rosalie Hardman Blalock. 
She is identified throughout the record as Rose, Rosie, and Rosalie and by the surnames
Hardman and Blalock. She is identified as Rose Hardman in this opinion.
4. The Keeton factors are: (1) the circumstances of the capital offense, including the
defendant's state of mind and whether he or she was working alone or with other parties; (2) the
calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the
crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and
personal circumstances at the time of the offense; (6) whether the defendant was acting under
duress or the domination of another at the time of the commission of the crime; (7) psychiatric
evidence; and (8) character evidence. Keeton, 724 S.W.2d at 61.
5. In 1989, the Texas Department of Criminal Justice ("TDCJ") was formed and absorbed 
TDC.
6. The State refers to DeAnda as Juan DeAnda in its brief. Because DeAnda identified
himself as Johnny in his former testimony, he is referred to as Johnny in this opinion.
7. The record in this case does not affirmatively establish who shot Mendez.
8. Not all of appellant's disciplinary incidents during that period of time occurred while he
was in the custody of TDCJ. Disciplinary infractions that occurred while he was in the custody
of county corrections officials are not included on that list of 34 incidents unless reported to
TDCJ by county authorities.
9. "Chunking" is causing another person to contact the blood, seminal fluid, vaginal fluid,
saliva, urine, or feces of the actor, any other person, or an animal.
10. We note that, in the summary of his argument regarding this point of error, appellant
mentions that the extraneous offense evidence was admitted "with no adequate notice." 
Appellant did not object to lack of notice during trial and does not expand this statement in his
brief. Therefore, we do not address the issue of notice. See Tex. R. App. 33.1 & 38.1.
11. Texas Rule of Evidence 804(b)(1) provides that "[i]n criminal cases, testimony given
as a witness at another hearing of the same or a different proceeding, if the party against whom
the testimony is now offered had an opportunity and similar motive to develop the testimony by .
. . cross[-]examination" is not excluded as hearsay if the witness is unavailable.
12. The Court notes that appellant's second motion, as it appears in the record, is
handwritten. The Court understands the motion to object pursuant to Crawford v. Washington,
541 U.S. 36 (2004), and its progeny, as well as pursuant to the Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution. Appellant's objection pursuant to the Sixteenth
Amendment, which allows Congress to levy and collect taxes, is inapposite and will not be
addressed.
13. 492 U.S. 302 (1989) ("Penry I").
14. The supplemental instruction stated:


 You are instructed that when you deliberate on the questions posed in the special
issues, you are to consider mitigating circumstances, if any, supported by the
evidence presented in both phases of trial, whether presented by the State or the
defendant. A mitigating circumstance may include, but is not limited to, any
aspect of the defendant's character and record or circumstances of the crime
which you believe could make a death sentence inappropriate in this case. If you
find that there are any mitigating circumstances in this case, you must decide how
much weight they deserve, if any, and thereafter, give effect and consideration to
them in assessing the defendant's personal culpability when answering the issue
under consideration. If you determine, when giving effect to the mitigating
evidence, if any, that a life sentence, as reflected by a negative finding to the issue
under consideration, rather than a death sentence, is an appropriate response to the
personal culpability of the defendant, a negative finding should be given to that
special issue under consideration.
15. Appellant refers to Article 37.0721 in his brief. However, there is no Article 37.0721
in the Texas Code of Criminal Procedure. We presume appellant intends to refer to Article
37.0711.